Fielding M. McGEHEE, III, Appellant

v.

CENTRAL INTELLIGENCE AGENCY.

No. 82–1096.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 15, 1982.

Decided Jan. 4, 1983.

Katherine A. Meyer, Washington, D.C., with whom Alan B. Morrison, Washington, D.C., was on the brief, for appellant.

John H.E. Bayly, Jr., Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., and Emilio Jaksetic, Atty., C.I.A., Washington, D.C., were on the brief, for appellee.

Before WRIGHT, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Separate opinion concurring and dissenting in part filed by Circuit Judge BORK.

TABLE OF CONTENTS

| | Page |
|---|---|
| Introduction | 1097 |
| I. BACKGROUND | 1097 |
| II. THE USE OF A TIME-OF-REQUEST CUT-OFF DATE | 1100 |
| A. Applicable Law | 1100 |
| B. The Legality of the Agency's Rule Adopting A Time-of-Request Cut-off Date | 1102 |
| C. The Reasonableness of the Agency's Procedure in This Instance | 1103 |

**1.** 5 U.S.C. § 552 (1976 & Supp. V 1981).

| | Page |
|---|---|
| III. THE REFERRAL PROCEDURE | 1105 |
| A. "Agency Records" Covered by the Act | 1105 |
| B. Treatment of Documents Obtained From Other Agencies | 1109 |
| IV. INVOCATION OF THE "INTELLIGENCE SOURCE" EXEMPTION | 1112 |
| CONCLUSION | 1114 |

HARRY T. EDWARDS, Circuit Judge:

We are asked in this case to decide several questions concerning the scope of the duties imposed on government agencies by the Freedom of Information Act ("FOIA" or "the Act").[1] The District Court granted appellee's motion for summary judgment on the theories that appellee had conducted a sufficiently thorough search for documents subject to disclosure and had released to appellant all of the materials required by the Act. In reaching these conclusions, the District Court upheld as reasonable an *unpublicized* Central Intelligence Agency ("CIA" or "the agency") rule which had the effect of limiting the FOIA search to materials in the agency's possession on the date when appellant made his initial request for documents. This "time-of-request cut-off" policy was approved by the trial court even though the agency failed to disclose any documents to appellant until compelled to do so by an order of the court almost two and one-half years after the original time of request. The District Court also granted appellee's motion to dismiss from the lawsuit all records in the possession of the CIA that had been obtained from the State Department or the Federal Bureau of Investigation ("FBI"). Finally, the District Court relied solely on affidavits submitted by the CIA in upholding the nondisclosure of a number of disputed documents under FOIA exemptions (1) and (3).[2] Because we conclude that the District Court's rulings were founded upon misinterpretations of applicable legal standards, we reverse and remand for further proceedings.

## I. BACKGROUND

The outcome of this case turns substantially upon nuances in its facts. According-

**2.** 5 U.S.C. § 552(b)(1), (3) (1976).

ly, the procedural background to this appeal will be described at some length.[3]

Appellant McGehee is a free-lance journalist and a relative of three victims of the gruesome demise of the "People's Temple" in Jonestown, Guyana. Many of the circumstances surrounding the Jonestown Tragedy are well known, indeed notorious. In November, 1978, Congressman Leo J. Ryan and a portion of his staff traveled to Guyana to investigate allegations of mistreatment of some of his constituents in the Jonestown religious community. On November 18, as they were about to board a plane to leave, Ryan, three representatives of the media, and one apparent defector from the community were shot and killed. Within hours, almost all of the more than 900 members of the Jonestown congregation, including its founder, Jim Jones, either committed suicide or were murdered.[4]

Despite the extensive attention given the Jonestown Tragedy, the character of the People's Temple religious community, the events leading up to the catastrophe, and the manner in which so many people died remain somewhat mysterious. Proceeding on the assumption that the CIA possesses recorded information that sheds light on these matters, McGehee, on December 6, 1978, filed the FOIA request that gives rise to this controversy. McGehee initially asked for documents relating to several aspects of the development and fate of Jim Jones' congregation.[5] On December 22, at the suggestion of a representative of the agency, he narrowed his request to records pertaining to the "Peoples Temple."[6]

The treatment accorded McGehee's request during the following month is not entirely clear from the record. It appears that the agency's Information and Privacy Division ("IPD"), the office that coordinates responses to requests for information, determined that two other divisions—the Directorate of Operations ("DO") and the Office of Security ("OS")—were the offices most likely to possess documents of the sort McGehee was seeking. Accordingly, those two divisions were "tasked"—i.e., asked to search for and identify relevant records. Each division apparently was instructed to confine its attention to documents received on or before December 22, 1978, the day McGehee's request was finalized. Soon thereafter OS informed IPD that it had found no such materials. An initial search by DO, on the other hand, revealed the existence of responsive documents, but DO at this time appears not to have informed IPD of its findings. Nor does DO seem to have made any effort at this point to re-

---

**3.** In stating those facts relevant to the District Court's grant of summary judgment to appellee, *see* text at note 16 *infra,* we of course view the record in the light most favorable to appellant and afford appellant the benefit of all legitimate inferences to be drawn therefrom. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Ring v. Schlesinger,* 502 F.2d 479, 490 n. 16 (D.C.Cir.1974); *Weiss v. Kay Jewelry Stores,* 470 F.2d 1259, 1261–62 (D.C.Cir.1972).

**4.** For more detailed accounts of these events, see STAFF INVESTIGATIVE GROUP TO THE HOUSE COMM. ON FOREIGN AFFAIRS, THE ASSASSINATION OF REPRESENTATIVE LEO J. RYAN AND THE JONESTOWN, GUYANA TRAGEDY, H.R.Doc. No. 223, 96th Cong., 1st Sess. 1–7 (1979); *By Death Possessed,* N.Y. Times, Nov. 26, 1978, § 4 (The Week in Review), at 1.

**5.** The subjects designated in his December 6 letter were:
 1. The Peoples Temples [sic] which was founded in Indianapolis in the 1960's and which had subsequent addresses in Ukiah, Redwood Valley, and San Francisco, California, and Jonestown, Guyana;
 2. The Agricultural Project, or Peoples Temple Agricultural Project, in Jonestown, Guyana;
 3. Jonestown, Guyana;
 4. The late Rev. James Jones, minister of Peoples Temple;
 5. The late Carolyn Moore Layton, who died in Jonestown on November 19, and who has been described by several newspapers as the co-ordinator of Peoples Temple in Rev. Jones' absense [sic].
 6. Information on Peoples Temple "defectors", "hit squads," and "assassination teams."
Appendix ("App.") 150.

**6.** App. 9, 144, 199. At the same time, he agreed to pay the search and copying costs required by the agency (pursuant to the Act). *See* 5 U.S.C. § 552(a)(4)(A) (1976).

view or even to retrieve the identified documents. Meanwhile, IPD learned that a third division, the National Foreign Assessment Center/Office of Central Reference ("NFAC/OCR"), had completed a computer search in response to an earlier FOIA request very similar to McGehee's (the "Douglas request") and had identified relevant documents in the agency's possession.[7] However, no immediate effort was made to retrieve those documents either. Instead, McGehee's request (which was marked with some kind of notation of the location of records that might prove responsive) was placed at the end of a "processing queue," the CIA's system for dealing with FOIA requests on a "first-in-first-out basis."[8]

This initial flurry of activity had subsided by mid-January, 1979. Between that time and December, 1980, the agency did virtually nothing about McGehee's request.[9] Beginning in March, 1979, McGehee periodically contacted the CIA, either directly or through counsel, to ascertain the status of his request. The agency provided him with no information regarding the steps it had taken and gave him no definite indication of when any responsive documents would be released.[10] Never did the agency inform McGehee that it had adopted December 22, 1978 as a "cut-off date" for its searches.

On November 21, 1980, McGehee filed suit in the District Court seeking to compel the CIA to respond to his pleas.[11] On March 3, 1981, the court set a deadline of May 5, 1981, by which time the agency was to complete its processing of McGehee's request, release all nonexempt responsive material, and submit a *Vaughn* index [12] cataloging any withheld documents. Soon thereafter the court granted the agency's motion for a protective order, shielding the CIA from discovery by McGehee. On May 5, in compliance with the court's directive, the agency revealed (for the first time) that it possessed 84 documents responsive to McGehee's request.[13] It disposed of those

---

7. In what office(s) these records were stored is not evident.

8. It is unclear whether this "processing queue" is a device used by DO to handle requests forwarded to it or an agency-wide procedure. The affidavit submitted by John Bacon suggests the former, App. 202–03; appellee's counsel at oral argument seemed to assume the latter. To the extent that this question bears upon the reasonableness of the agency's overall system for responding to FOIA requests, *see* Part II. *infra,* it will have to be resolved on remand.

9. The only further action that appears in the record is another search by DO for documents in its possession responsive to either the Douglas request or McGehee's request. Though conducted sometime in November, 1980, this search, like all the others, was limited to materials obtained by the agency on or before December 22, 1978. Why such a supplementary inquiry was conducted, particularly since no effort was made to identify more recently received documents, is not apparent. The search yielded no additional documents.

10. At different points, McGehee was told, variously, that it would be "approximately three months" before his request was processed, that his request "was currently being processed," and that the date of a substantive response could not be predicted. App. 6, 144–46.

11. Jurisdiction for the suit was predicated on 5 U.S.C. § 552(a)(4)(B) (1976), which provides, in pertinent part:

> On complaint, the district court of the United States . . . in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action.

12. *See Vaughn v. Rosen,* 484 F.2d 820, 826–28 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). For a recent description of what such an index entails, see *Dellums v. Powell,* 642 F.2d 1351, 1359 (D.C. Cir.1980).

13. A significant number of these records were discovered in the course of searches conducted in March and April, 1981, by three previously uninvolved offices of the agency—the Office of Legislative Counsel, the Executive Registry of the Office of the Director of Central Intelligence, and the Office of Public Affairs. App. 202–03. The fact that IPD did not "task" these divisions until requested to do so by the Office

materials as follows: 12 were released in full; 18 were released with substantial portions deleted; 26 were withheld; 28 were forwarded to other government agencies, from which the CIA had originally obtained them.

The last set of records is one of the hubs of this controversy. It is undisputed that, of the 28 "other agency" documents, 27 had originated with the State Department and one with the FBI. In accordance with its standard procedure, the CIA declined to undertake any kind of substantive review of the "other agency" records and instead sent them to the agencies that first compiled them to enable those agencies to determine whether any material was exempt from disclosure.[14] McGehee has not submitted a FOIA request to either the State Department or the FBI, insisting that the CIA is required by the Act to evaluate and release the documents in question. Nevertheless, the State Department has voluntarily reviewed the 27 records that it originally created and has released a majority of them to McGehee.[15] The fate of the FBI document does not appear from the record.

In the summer of 1981, McGehee accidentally learned, from a letter written by a representative of the CIA to a third party, that the agency had been treating the time of his original request as a cut-off date for its FOIA search. Moreover, comments made in that letter raised the possibility that the agency had limited its searches to files denominated "People's Temple" and had not sought information under any closely related headings—e.g., the Reverend James Jones or Jonestown. See App. 191.

On January 19, 1982, despite these revelations, the District Court issued final judgment in the case. The court denied McGehee's motion for an *in camera* inspection of

the withheld and edited documents to test the basis for the agency's refusal to release them, granted the CIA's motion to dismiss from the lawsuit the documents it had obtained from the State Department and FBI, and granted the CIA's motion for summary judgment as to the remainder of the suit.[16] This appeal followed.

## II. THE USE OF A TIME-OF-REQUEST CUT-OFF DATE

McGehee's first challenge concerns the CIA's decision to limit its search to records in its possession on the date when his request was finalized. He points out that the agency did not disclose any documents to him until compelled to do so by an order of the District Court almost two and one-half years after his original request. Under these circumstances, he argues, the agency failed to discharge its statutory obligation when it retrieved and released only documents that originated with and were in the possession of the CIA during the first month following the events to which his request principally related.

### A. *Applicable Law*

 We begin by reviewing the legal principles that govern McGehee's claim. First, it is well established that the adequacy of an agency's response to a FOIA request is measured by a standard of reasonableness. As this court recently noted:

[A]n agency is not " 'required to reorganize its [files] in response to' " a demand for information, but it does have a firm statutory duty to make *reasonable* efforts to satisfy it.

*Founding Church of Scientology v. National Security Agency,* 610 F.2d 824, 837 (D.C.Cir. 1979) (footnotes omitted) (emphasis add-

---

of General Counsel (after appellant had commenced litigation) casts some doubt on the thoroughness of the agency's initial investigation.

**14.** *See* 32 C.F.R. § 1900.43(c) (1981) (prescribing such treatment of records that "originated with another government agency").

**15.** The State Department's disclosure was prompt but incomplete. On June 2, 1981 (within a month of the time the documents were forwarded to it), the agency disposed of the records as follows: 14 were released in full; 7 were released with portions deleted; 6 were withheld.

**16.** *McGehee v. CIA,* 533 F.Supp. 861 (D.D.C. 1982).

ed).[17] This same standard of reasonableness that has been applied to test the thoroughness and comprehensiveness of agency search procedures is equally applicable to test the legality of an agency rule establishing a temporal limit to its search effort. In other words, a temporal limit pertaining to FOIA searches (such as the "time-of-request cut-off" policy that is at issue in this case) is only valid when the limitation is consistent with the agency's duty to take *reasonable* steps to ferret out requested documents.[18]

Second, we hold that the agency bears the burden of establishing that any limitations on the search it undertakes in a particular case comport with its obligation to conduct a reasonably thorough investigation. It seems to us clear that the burden of persuasion on this matter is properly imposed on the agency. The Act explicitly assigns to the agency the burden of persuasion with regard to the closely related issue of the legitimacy of the agency's invocation of a statutory exemption to justify withholding of material.[19] Two considerations indicate that the same rule should govern the issue before us. One is that the information bearing upon the reasonableness of any temporal or other limitation on a search effort is within the agency's exclusive control.[20] The other is that the Act as a whole is clearly written so as to favor the disclosure of any documents not covered by one of the enumerated exemptions.[21] Insofar as burdens of persuasion are generally assigned to parties advancing disfavored contentions,[22] the agency should bear the responsibility of convincing the trier of fact that its less than comprehensive search is reasonable under the circumstances.[23]

Third, the fact that the subject of this appeal is the grant of appellee's motion for summary judgment means that the agency must satisfy a significant legal standard in order to carry its burden. The standard has been stated as follows:

> It is well settled in Freedom of Information Act cases as in any others that "[s]ummary judgment may be granted only if the moving party proves that no substantial and material facts are in dispute and that he is entitled to judgment as a matter of law." ... [Moreover, the]

---

**17.** *See also id.* at 836; *Goland v. CIA,* 607 F.2d 339, 353 (D.C.Cir.1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *National Cable Television Ass'n v. FCC,* 479 F.2d 183, 192 (D.C.Cir.1973).

**18.** At oral argument, appellee's counsel proposed that we adopt a more deferential standard with respect to temporal limits on FOIA searches. It was suggested that courts should defer to agency policies as long as the procedures followed are somehow "rational." The standard suggested by appellee and the reasoning on which it is based are wholly inconsistent with both the terms and the spirit of the FOIA. The statute is plainly written so as to disfavor any effort by agency officials to shirk their responsibilities to respond promptly and fully to requests for records. *See, e.g.,* 5 U.S.C. § 552(c) (1976 & Supp. V 1981). Furthermore, the Act clearly contemplates that courts will scrutinize closely any withholding of documents. *See* 5 U.S.C. § 552(a)(4)(B) (1976).

**19.** *See* 5 U.S.C. § 552(a)(4)(B) (1976).

**20.** This circumstance has traditionally been recognized as an important factor in the allocation of burdens of persuasion. *See, e.g., Rossi v. United States,* 289 U.S. 89, 91–92, 53 S.Ct. 532, 533, 77 L.Ed. 1051 (1933); 9 WIGMORE, EVIDENCE § 2486 (Chadbourn rev. 1981); James, *Burdens of Proof,* 47 VA.L.REV. 51, 60 (1961).

**21.** 5 U.S.C. § 552(c) (1976 & Supp. V 1981) makes this point explicit, but the same principle infuses the other provisions of the Act. *See Department of the Air Force v. Rose,* 425 U.S. 352, 360–61, 96 S.Ct. 1592, 1598–1599, 48 L.Ed.2d 11 (1976).

**22.** *See* James, *supra* note 20, at 61; *cf.* WIGMORE, *supra* note 20, at § 2486 ("no one principle" controls; the "ultimate basis" for allocation of burdens of persuasion is "broad reasons of experience and fairness").

**23.** The establishment of this principle is not essential to our disposition of the case because, no matter who would bear the burden of persuasion on this issue at trial, to prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine issue of material fact even with regard to matters that the other party would ordinarily be required to establish. *Church of Scientology,* 610 F.2d at 836. We are indicating the proper allocation of the burden of proof solely to offer guidance to the District Court in case, on remand, the question arises in a context other than a motion for summary judgment.

" 'inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' "

*Church of Scientology,* 610 F.2d at 836 (footnotes omitted).[24] Thus, for the CIA to have properly prevailed in the case at bar, it must have shown that no material fact relevant to the reasonableness of its use of a time-of-request cut-off date was in dispute and that the evidence established that the procedure employed was reasonable "as a matter of law." In deciding whether the agency had made such a showing, the District Court was entitled to rely upon affidavits submitted by the agency, describing its search procedures and explaining why a more thorough investigation would have been unduly burdensome. *Id.*[25] But such affidavits would suffice only if they were relatively detailed, nonconclusory and not impugned by evidence in the record of bad faith on the part of the agency. *Id.*[26]

**B. *The Legality of the Agency's Rule Adopting A Time-of-Request Cut-off Date***

■ In light of the foregoing principles, we must now determine whether the District Court fairly could have concluded that the CIA's decision to limit its search to documents in its possession as of the date of McGehee's finalized request was consistent with its statutory obligations. The agency would have us decide this question from a generic standpoint; it argues that language in the FOIA and authoritative case law interpreting the statute establish that the use of a time-of-request cut-off date is *always* reasonable. However, we are convinced that none of the arguments advanced by the agency to support this sweeping claim survives scrutiny.

The CIA first points to the statutory provision requiring that the materials sought by a FOIA request be "reasonably describe[d]." [27] That provision pertains to the subject matter, location and form of materials sought by a request, not to the times at which responsive documents are acquired.[28] The CIA next directs our attention to two cases holding that an agency has no duty continuously to update its responses to a FOIA request.[29] The doctrine tentatively

---

**24.** *See also Weisberg v. United States Dep't of Justice,* 627 F.2d 365, 368 (D.C.Cir.1980).

**25.** *See also Goland v. CIA,* 607 F.2d at 352.

**26.** *See also Goland v. CIA,* 607 F.2d at 352. Circumstances surrounding the processing of McGehee's request do indeed suggest that the agency has not acted in good faith. *See* text at notes 82–84 *infra.* Thus, we might conclude that the agency has not established that its search procedure was reasonable solely on the ground that the credibility of the affidavit it submitted in support of that proposition (App. 193–214) is undermined by evidence of bad faith. However, in order to offer some guidance to present and future litigants concerning the legitimacy of the use of cut-off dates, we prefer not to rest our decision on that narrow premise and proceed instead on the (counterfactual) assumption that the statements made in the agency's affidavits are worthy of the usual measure of credit.

**27.** 5 U.S.C. § 552(a)(3)(A) (1976).

**28.** *See Marks v. United States,* 578 F.2d 261, 263 (9th Cir.1978). *Cf. Sears v. Gottschalk,* 502 F.2d 122, 125–26 (4th Cir.1974), *cert. denied sub nom. Sears v. Dann,* 425 U.S. 904, 96 S.Ct. 1494, 47 L.Ed.2d 753 (1976); *Bristol-Myers Co. v. FTC,* 424 F.2d 935, 938 (D.C.Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970) (both cases interpreting § 552(a)(3) as it stood before Congress, in 1974, replaced the language referring to "identifiable records" with the present requirement that records be "reasonably describe[d]").

The CIA makes much of some language by this court in *Krohn v. Department of Justice,* 628 F.2d 195, 198 (D.C.Cir.1980), interpreting this provision. Contrary to the agency's insinuations, *Krohn* merely proscribed requests that either were excessively vague or required the agency to engage in analysis. The opinion never addressed the question of the legitimate time frame of a FOIA request.

**29.** *See Tuchinsky v. Selective Serv. Sys.,* 418 F.2d 155, 158–59 (7th Cir.1969); *Lybarger v. Cardwell,* 438 F.Supp. 1075, 1077 (D.Mass. 1977), *aff'd,* 577 F.2d 764, 767 (1st Cir.1978). The *Tuchinsky* opinion does appear to draw the line defining the agency's disclosure obligations in terms of "material 'current' when the request was made for the 'current memoranda.' " 418 F.2d at 158–59. But, given the facts of the case and its posture on appeal, it seems plain that the court never intended to give blanket approval to a time-of-request cut-off date.

established[30] by those decisions is inapposite. The question presented in this case is whether, when an agency *first* releases documents to a requester, it may use as a cut-off date the time of his original demand. That an agency has no obligation, after it has once responded fully to a FOIA request, "to 'run what might amount to a loose-leaf service'" for the benefit of the applicant[31] has little bearing on the issue before us. Finally, the CIA points to case law suggesting that one cannot modify a FOIA request in mid-litigation.[32] Those decisions establish, at most, that a requester is not permitted to alter or refine the *subjects* to which he originally directed attention; they have nothing to do with the legality of the use of the time of a request as a temporal limit to a FOIA search.[33]

### C. The Reasonableness of the Agency's Procedure in This Instance

█ Having concluded that neither the terms of the statute nor the case law interpreting them supports a claim that the use of a time-of-request cut-off date is *always* proper, we are compelled to turn to the particular facts of the case before us to assess the reasonableness of the agency's conduct. McGehee directs our attention to circumstances that, on their face, cast considerable doubt on the merits of the agency's procedure. The CIA took almost two and one-half years to respond to McGehee's request. Yet, when it finally released documents, the CIA chose to limit itself to records that originated with and were possessed by the agency during the first 35 days following the Jonestown Tragedy. Were these facts all that appeared in the record, we would be very hard pressed to sustain the agency's actions.

The CIA attempts to dispel the skepticism to which the foregoing circumstances give rise by arguing that it would be exceedingly difficult to conduct its processing of FOIA requests on any other basis. In the affidavit of John Bacon submitted to the District Court, in its brief to this court, and in oral argument, the agency has consistently maintained that uniform use of a time-of-request cut-off date is essential to avoid an "administrative nightmare." To support this claim, the agency points to the benefits of "precis[ion]" (the value of having a single cut-off date that all agency divisions know in advance),[34] the "confusion" that might be engendered by different agency components using different cut-

There is no indication in the opinion that there had been any significant delay between the time of the request and the time of the agency's response. More importantly, the aforementioned language appears in the course of an affirmance of the lower court's ruling (as reconstructed by the court of appeals) that (i) "current memoranda" must be released but (ii), "in the future, memoranda need not be sent to persons in plaintiff's position until a request is made for the material then current ...." *Id.* In short, the court was concentrating on the question whether a demand for "current" material of a particular sort triggers a continuing obligation to forward to the requester copies of all documents of that sort that subsequently come into the agency's possession, not on the scope of the agency's duty with regard to documents obtained between the time of the initial demand and the time of the agency's first full response.

30. Aspects of each of the decisions cited weaken the force of their holdings even on the narrow question of an agency's duty to update disclosures. The court in *Tuchinsky* was interpreting an early version of the FOIA, before Congress in 1974 and 1976 had reiterated its commitment to the principle of full disclosure of all records not properly covered by enumer-

ated, strictly interpreted exemptions, *see* notes 18, 21 *supra*. And the court in *Lybarger* merely refused to grant the petitioner's sweeping request that it "be placed on a mailing list to receive as a matter of routine any updated materials." 577 F.2d at 765. Moreover, the District Court in *Lybarger* explicitly declined to adopt what it characterized as "the stringent holding of *Tuchinsky*." 438 F.Supp. at 1077.

31. *Tuchinsky v. Selective Serv. Sys.,* 418 F.2d at 158.

32. *See Irons v. Levi,* 451 F.Supp. 751, 753 (D.Mass.1978), *rev'd on other grounds sub nom. Irons v. Bell,* 596 F.2d 468 (1st Cir.1979); *Fonda v. CIA,* 434 F.Supp. 498, 501 (D.D.C. 1977).

33. The agency's attempt to rely on some language in *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 155 n. 9, 100 S.Ct. 960, 971 n. 9, 63 L.Ed.2d 267 (1980), is likewise unsuccessful. The comments referred to by appellee merely suggest that an agency has no duty to retrieve and release documents it once possessed but that it legitimately disposed of *prior* to the date a FOIA request was received.

34. *See* App. 207, 209, 211.

off dates (*e.g.*, each division using the date at which it commenced searching for documents),[35] the alleged cost and inconvenience to the agency of conducting the successive, duplicative searches that might be necessary if the date of a final response or the date ·of litigation were employed as a cut-off date,[36] and the disruption of the agency's fee schedules that would accompany the use of anything other than its present procedure.[37]

In the absence of more detailed substantiation, these claims strike us as either unpersuasive or irrelevant. Indeed, alternative procedures, without the flaws of the time-of-request cut-off policy and without any real potential for the administrative nightmares alleged by appellee, readily come to mind. The following procedure is an example:

---

SAMPLE PROCEDURE APPLYING A REASONABLE "CUT-OFF" DATE TO A FOIA SEARCH

Soon after the CIA first receives a request, IPD "tasks" divisions of the agency it considers likely to have access to responsive documents. Those divisions determine whether they have any such materials[38] and so inform IPD. IPD then notifies the requester that the agency possesses some relevant documents and will process his request as soon as it has completed processing all requests it received earlier. When the request nears the head of the "queue," IPD instructs each agency division that it thinks might possess relevant records to conduct, at that time, a thorough search for *all* responsive documents in its possession, to retrieve identified records forthwith, and to submit them to the central office for evaluation by persons able to determine whether any material is exempt. Substantive review follows promptly and all nonexempt material is released.

---

We do not offer the foregoing Sample as a directive to the agency, a procedure with which it is henceforth bound to comply. Nor do we mean to endorse a procedure fraught with excessive time delays.[39] In designing the system, we have taken for granted the fact that the CIA is experiencing inordinate delays in processing FOIA requests; a different procedure might be more suitable for an agency that responds to requests on a relatively current basis. In sum, we set forth the Sample Procedure merely to indicate that one can easily imagine a system that incorporates a cut-off date much later than the time of the original request, that results in a much fuller search and disclosure than the procedure presently used by the agency, that forecloses the necessity for an excessive number of supplementary demands (*see* note 42 *infra*), and that does not appear unduly burdensome, expensive, or productive of "administrative chaos."

It is possible that circumstances unknown to us or to the District Court do indeed render unfeasible any such alternative, more responsive procedure. If so, the agency's argument that its present practice is "reasonable" would be powerful. We therefore remand this portion of the case with instructions to afford the agency an opportunity to adduce additional relevant testimony.[40] It should be clear, however, that to prevail on this issue, the agency will have to do better than it has thus far.[41]

---

**35.** *See* App. 207, 211.

**36.** *See* App. 207, 209–10.

**37.** *See* App. 207, 210, 213.

**38.** From what appears in the record in this case, such a preliminary, non-exhaustive determination that the agency possesses at least some responsive materials would not be at all burdensome.

**39.** In particular, we express no opinion on the question whether the use of a "processing queue," resulting in "first-in-first-out" treatment of FOIA requests, is consistent with an agency's statutory obligations ordinarily to determine "within ten days" whether to comply with such requests, "immediately" to notify requesters of its decisions, 5 U.S.C.

§ 552(a)(6)(A)(i) (1976), and "promptly" to make responsive documents available, 5 U.S.C. § 552(a)(3) (1976). Nor do we consider whether the effect of such "queues" in substantially delaying the referral to other agencies of documents that both were compiled by and are arguably more appropriately evaluated by those bodies, *see* note 70 *infra* and accompanying text, constitutes an "improper withholding" of such documents within the meaning of 5 U.S.C. § 552(a)(4)(B) (1976), *see* text at notes 67–70 *infra*.

**40.** As indicated above, such additional evidence might take the form of more detailed (and persuasive) affidavits. *See* text at notes 25–26 *supra*.

**41.** In its brief and at oral argument, the agency hinted at an additional justification for its use

One additional aspect of this general problem merits brief attention. It would be extremely difficult for the CIA to convince us that it may "reasonably" use *any* cut-off date without so informing the requester. Such notification would involve an insignificant expenditure of time and effort on the part of the agency. And it would enable the requester to submit supplementary demands for information if he felt so inclined.[42] Unless on remand some extraordinary showing is forthcoming of why the agency should not be required to inform requesters of the dates it is using, the CIA's *unpublicized* temporal limitation of its searches should be held invalid.[43]

### III. THE REFERRAL PROCEDURE

McGehee's second allegation of error is that the District Court improperly granted the CIA's motion to dismiss from the lawsuit the records it had obtained from the State Department and FBI. As was true with regard to the issue just discussed, the general principles governing McGehee's claim are well known but their application to the specific question presented has never been resolved.

### A. *"Agency Records" Covered by the Act*

■ The Supreme Court has recently clarified the conditions under which a federal court may compel an agency to release documents. In *Kissinger v. Reporters Com-* *mittee for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), the Court held:

> The FOIA represents a carefully balanced scheme of public rights and agency obligations designed to foster greater access to agency records than existed prior to its enactment. That statutory scheme authorizes federal courts to ensure private access to requested materials when three requirements have been met. Under 5 U.S.C. § 552(a)(4)(B) federal jurisdiction is dependent upon a showing that an agency has (1) "improperly"; (2) "withheld"; (3) "agency records." Judicial authority to devise remedies and enjoin agencies can only be invoked, under the jurisdictional grant conferred by § 552, if the agency has contravened all three components of this obligation.

*Id.* at 150, 100 S.Ct. at 968.[44]

The CIA argues vigorously that the District Court's decision in the instant case was proper under the third branch of this test. Records that are in the possession of the agency to which a FOIA request is submitted but that were originally compiled by another agency, the CIA insists, are not "agency records" within the meaning of the Act. So stated, the argument seems rather implausible, but this was indeed the theory on which the District Court rested its ruling.[45]

---

of a time-of-request cut-off procedure. The agency suggested that any alternative system would somehow prevent it from expeditiously processing relatively simple requests. We frankly find this argument, as presented, incomprehensible, but the agency will have a chance on remand to bring forward further evidence in support of this claim as well.

**42.** Appellant persuasively argues that he would have made such additional requests had he been aware of the CIA's processing procedures. Appellant's Brief at 18–19.

**43.** If the trial court so holds, it will of course have to afford the appellant some relief. Ex-

actly what that remedy should be is not obvious. Aside from noting that the general goal should be to put the appellant, to the extent practicable, in the position he would have occupied had the agency acted reasonably, we think it best to leave the remedial question to the equitable discretion of the District Court.

**44.** *See also id.* at 161, 100 S.Ct. at 974 (Stevens, J., concurring in part and dissenting in part); *Forsham v. Harris,* 445 U.S. 169, 177, 100 S.Ct. 977, 982, 63 L.Ed.2d 293 (1980); *Coastal States Gas Corp. v. Department of Energy,* 644 F.2d 969, 974 (3d Cir.1981).

**45.** *See McGehee v. CIA,* 533 F.Supp. at 868.

Evaluation of this argument proves surprisingly difficult because of the absence of statutory or precedential guidance. As has often been remarked,[46] the Freedom of Information Act, for all its attention to the treatment of "agency records," never defines that crucial phrase.[47] A reading of the legislative history yields insignificant insight into Congress' conception of the sorts of materials the Act covers.[48] And we gain little by ransacking the case law interpreting the FOIA; no appellate court has expressed an opinion on the question of the legal status of documents prepared by one agency in the possession of another.[49]

**46.** *See, e.g.,* Note, *The Definition of "Agency Records" Under the Freedom of Information Act,* 31 STAN.L.REV. 1093, 1093 (1979); Note, *What Is a Record? Two Approaches to the Freedom of Information Act's Threshold Requirement,* 1978 B.Y.U.L.REV. 408, 408; *Nichols v. United States,* 325 F.Supp. 130, 134 (D.Kan. 1971), *aff'd on other grounds,* 460 F.2d 671 (10th Cir.), *cert. denied,* 409 U.S. 966, 93 S.Ct. 268, 34 L.Ed.2d 232 (1972).

**47.** The Administrative Procedure Act, 5 U.S.C. §§ 551–559 (1976 & Supp. V 1981), of which the FOIA is a part, likewise fails to provide an adequate definition. Section 552a(a)(4) does define the term "record" for the purposes of the Privacy Act, but that definition, relating to files maintained by agencies on particular individuals, is not germane to the general question of what constitutes an "agency record."

The only other arguably relevant statutory definition of "record" is equally unhelpful. *See* 44 U.S.C. § 3301 (1976) (expansive definition for purposes of the "disposal of records").

**48.** Only *two* aspects of the legislative history shed any light on the intended meaning of the term "record." First, in the Senate hearings, a representative of the ICC observed, "[s]ince the word 'records' ... is not defined, we assume that it includes all papers which an agency preserves in the performance of its functions." *Administrative Procedure Act: Hearings on S. 1160, S. 1336, S. 1758, and S. 1879 Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary,* 89th Cong., 1st Sess. 244 (1965). This expansive reading of the term is consistent with the conclusions we reach below, but, in the absence of any response by the committee, its utility in illuminating Congress' intent is minimal. Second, one of the amendments to the bill made by the Senate Judiciary Committee consisted of the replacement of each reference to "agency records and information" or "agency records or information" with a simple "agency records." *See* S.REP. NO. 813, 89th Cong., 1st Sess. 1–2 (1965) [hereinafter cited as SENATE REPORT], *reprinted in,* SUBCOMM. ON ADMINISTRATIVE PRACTICE AND PROCEDURE OF THE SENATE COMM. ON THE JUDICIARY, 93D CONG., 2D SESS., FREEDOM OF INFORMATION ACT SOURCE BOOK: LEGISLATIVE MATERIALS, CASES, ARTICLES 36–37 (Comm. Print

1974) [hereinafter cited as SOURCE BOOK I]. This change, unexplained by the committee, is susceptible of so many conflicting interpretations as to be of little value in the present context. *See* Note, *What Is a Record?, supra* note 46, at 417 n. 47.

It is tempting to draw inferences from Congress' action in a related context. In 1975, it amended the Securities Exchange Act of 1934 to provide:

> For purposes of [the FOIA] the term "records" includes all applications, statements, reports, contracts, correspondence, notices, and other documents filed with or otherwise obtained by the Commission pursuant to this title or otherwise.

Securities Acts Amendments of 1975, Pub.L. No. 94–29, § 19, 89 Stat. 97, 158 (codified at 15 U.S.C. § 78x(a) (1976)). But, on reflection, it appears that this enactment is equally susceptible of two inconsistent interpretations. It might indicate that Congress *assumed* that "records" meant all documents "filed with" or "obtained by" an agency. Or it might reflect Congress' conviction that the public's interest in gaining access to materials held by the SEC was sufficiently great to necessitate an unusually encompassing definition, applicable solely to that agency.

**49.** At least three agencies, in their regulations promulgated pursuant to the FOIA, have taken the same position adopted by the District Court in the instant case. *See* 14 C.F.R. § 310.2(a) (1982) (records of other agencies in the possession of the CAB are not "Board 'records'"); 14 C.F.R. § 1206.101(a) (1982) ("The term 'agency records' ... does not include ... records of another agency, a copy of which may be in NASA's possession."); 22 C.F.R. § 171.10(b) (1982) ("The term 'record' ... does not include copies of the records of other Government agencies (except those which have been expressly placed under the control of the Department of State upon termination of another agency) ...."). One district court has come to the *opposite* conclusion. *See Tax Reform Research Group v. IRS,* 419 F.Supp. 415, 425 (D.D.C.1976) (a document (formerly) in the possession of an agency that was originally generated elsewhere is nevertheless an "agency record" [semble: at least if the possessor made some use of it]).

This and other courts have, on occasion, been called upon to decide whether other materials of ambiguous form or origin fall within the category of "agency records." It is upon some of those decisions that the District Court and the CIA principally rely in justifying the position they take in the instant case. Unfortunately, none of the cases in question is apposite. It has been held that, under certain circumstances, records in an agency's possession that originated with Congress do not constitute "agency records" for the purpose of the FOIA.[50] Likewise, materials prepared by or for the judiciary that eventually find their way into the hands of an agency cov-ered by the Act have been held to fall outside the crucial category.[51] The same is true of documents prepared by the President or his personal staff.[52] But two factors distinguish all of these cases from the situation before us. First, each of the departments of government listed above is itself exempt from the coverage of the FOIA.[53] Second, special policy considerations militate against a rule compelling disclosure of records originating in these three bodies merely because such documents happen to come into the possession of an agency. Congress, we have held, should not be forced to abandon either its long-acknowledged right to keep its records secret or its

**50.** *See Holy Spirit Ass'n for the Unification of World Christianity v. CIA,* 636 F.2d 838, 841 (D.C.Cir.1980) (dicta), *other portions of the decision vacated and remanded as moot,* 455 U.S. 997, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982); *Goland v. CIA,* 607 F.2d at 347–48; *Iglesias v. CIA,* 525 F.Supp. 547, 565 (D.D.C.1981); *cf. Ryan v. Department of Justice,* 617 F.2d 781, 785–86 (D.C.Cir.1980) (same principles apply to records of responses to questionnaires, in the possession of the Justice Department, prepared by individual Senators at the request of the Attorney General).

Not every record that originates with Congress escapes the coverage of the Act; such a document is held not to constitute an "agency record" only if a two-pronged test is satisfied: both "the circumstances attending the document's creation and the conditions under which it was transferred to the agency" must affirmatively indicate that Congress wished to retain primary control of the material. *Holy Spirit v. CIA,* 636 F.2d at 841; *see also Goland v. CIA,* 607 F.2d at 347–48. The only evidence the CIA has advanced to indicate that any of the records it obtained from the State Department or the FBI could pass such a "control" test is the fact that *some* of the documents at issue are classified and, apparently, not declassifiable by the CIA. *See* note 71 *infra.* Because we conclude that *all* records that originate in agencies covered by the Act constitute "agency records," we express no opinion on the question whether such restrictions on declassification, without more, would be sufficient to satisfy the *Goland/Holy Spirit* test.

**51.** *See Warth v. Department of Justice,* 595 F.2d 521, 523 (9th Cir.1979); *Cook v. Willingham,* 400 F.2d 885, 886 (10th Cir.1968) (per curiam); *Valenti v. United States Dep't of Justice,* 503 F.Supp. 230, 233 (E.D.La.1980); Note, *Disclosure of Grand Jury Materials Under Clayton Act Section 4F(b),* 79 Mich.L.Rev. 1234, 1243 n. 36 (1981).

It has been held, however, that, to escape categorization as "agency records," court documents, like Congressional documents, must pass an "intent to control" test. *See Carson v. U.S. Dep't of Justice,* 631 F.2d 1008, 1010–15 (D.C.Cir.1980); *Valenti v. Department of Justice,* 503 F.Supp. at 233 (semble).

**52.** *See Kissinger v. Reporters Comm.,* 445 U.S. at 156–57, 100 S.Ct. at 971–972. In buttressing its conclusion that the "mere physical location" in the hands of an agency of papers and materials prepared by a member of the President's staff did not convert them into "agency records," the Court emphasized factors relating principally to the absence of any *exercise* of control over the documents by the *possessor:*

> The papers were not in the control of the State Department at any time. They were not generated in the State Department. They never entered the State Department's files, and they were not used by the Department for any purpose. ·

*Id.* at 157, 100 S.Ct. at 972. This approach differs significantly from the *Goland/Holy Spirit* test, *see* notes 50–51 *supra,* which stresses manifestations by the *creator* of an intent to *retain* control.

**53.** *See* 5 U.S.C. § 551(1)(A) (1976) (exempting Congress); 5 U.S.C. § 551(1)(B) (1976) (exempting "the courts of the United States"); H.R.Rep. No. 1380, 93d Cong., 2d Sess. 15 (1974) (Conference Report), *reprinted in* Subcomm. on Government Information and Individual Rights of the House Comm. on Government Operations & Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary, 94th Cong., 1st Sess., Freedom of Information Act and Amendments of 1974 Source Book: Legislative History, Texts, and Other Documents 232 (Jt. Comm. Print 1975) [hereinafter cited as Source Book II] (clearly manifesting Congress' intent to exempt "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President").

ability to oversee the activities of federal agencies (a supervisory authority it exercises partly through exchanges of documents with those agencies "to facilitate their proper functioning in accordance with Congress' originating intent").[54] The courts, similarly, have an important interest in controlling the dissemination of their documents to the public,[55] yet, to facilitate the operation of the penal system, often must make those records available to departments of government covered by the Act. Finally, the importance of the confidentiality of communications between the President and his immediate advisors,[56] combined with the likelihood that records of those exchanges will find their way into portions of the "Executive Office of the President" covered by the Act,[57] render undesirable a *per se* rule that such documents are "agency records." In the present case, by contrast, the organs of government that first compiled the records—the State Department and FBI—clearly are covered by the Act.[58] And no policy considerations compa-

rable to those requiring special protection for documents emanating from Congress, the courts or the President's personal staff are applicable.[59]

In sum, the question whether a document in the possession of one agency that originated in another constitutes an "agency record" for the purposes of the FOIA is not governed by either the terms of the statute, the legislative history or precedent. To resolve the issue, we are thus compelled to look to the general principles that underlie the Act as a whole.

It has often been observed that the central purpose of the FOIA is to "open[ ] up the workings of government to public scrutiny."[60] One of the premises of that objective is the belief that "an informed electorate is vital to the proper operation of a democracy."[61] A more specific goal implicit in the foregoing principles is to give citizens access to the information on the basis of which government agencies make their decisions, thereby equipping the populace to evaluate and criticize those deci-

**54.** *Goland v. CIA,* 607 F.2d at 346. *See also Iglesias v. CIA,* 525 F.Supp. at 565; *Navasky v. CIA,* 499 F.Supp. 269, 278 (S.D.N.Y.1980).

**55.** *See Warth v. Department of Justice,* 595 F.2d at 523.

**56.** *Cf. United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) (dicta) (stressing the importance of the "need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties").

**57.** *See* 5 U.S.C. § 552(e) (1976).

**58.** *See* 5 U.S.C. §§ 551(1), 552(e) (1976).

**59.** In general, there would be no reason for one agency to expect that another, to whom it transferred a document, would be any more likely than itself to release the document to a requester. In the few instances in which the originating agency did indeed have sound reason to expect that no other department could process, as intelligently as it could itself, a FOIA request for a particular document, the legal standards we set forth below would enable the originator nevertheless to forward the document to another agency that had some use for it while retaining the right to pass upon any demand that the document be released to the public. *See* text at notes 73–74 *infra.* In sum,

a rule that all records generated by any agency covered by the Act are "agency records" does not inhibit the beneficial exchange of information by the various subdivisions of the federal bureaucracy.

**60.** *Stein v. Department of Justice and FBI,* 662 F.2d 1245, 1252 (7th Cir.1981). *See also Department of the Air Force v. Rose,* 425 U.S. 352, 360–62, 96 S.Ct. 1592, 1598–1599, 48 L.Ed.2d 11 (1976); *EPA v. Mink,* 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973); *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051, 1055 (D.C.Cir.1981) (en banc); *Warth v. Department of Justice,* 595 F.2d at 522; Project, *Government Information and the Rights of Citizens,* 73 Mich.L.Rev. 971, 1022–23 (1975); H.R.Rep. No. 1497, 89th Cong., 2d Sess. 1 (1966) [hereinafter cited as House Report], *reprinted in* Source Book I 22; Senate Report, *supra* note 48, at 3, *reprinted in* Source Book I 38.

**61.** Senate Report, *supra* note 48, at 3, *reprinted in* Source Book I 38. *See also FBI v. Abramson,* 456 U.S. 615, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982); *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2236, 57 L.Ed.2d 159 (1978); *Coastal States Gas Corp. v. Department of Energy,* 644 F.2d at 974; House Report, *supra* note 60, at 12, *reprinted in* Source Book I 33.

sions.[62] Each of these objectives—and particularly the last—would be best promoted by a rule that *all records in an agency's possession, whether created by the agency itself or by other bodies covered by the Act, constitute "agency records."*[63]

This conclusion is buttressed by consideration of the probable practical effect of a different rule. If records obtained from other agencies could not be reached by a FOIA request, an agency seeking to shield documents from the public could transfer the documents for safekeeping to another government department. It could thereafter decline to afford requesters access to the materials on the ground that it lacked "custody" of or "control" over the records and had no duty to retrieve them.[64] The agency holding the documents could likewise resist disclosure on the theory that, from its perspective, the documents were not "agency records." The net effect could be wholly to frustrate the purposes of the Act.

**B. Treatment of Documents Obtained From Other Agencies**

■ Our conclusion that the documents the CIA obtained from the State Department and FBI constitute "agency records" does not settle the fate of those materials. Two branches of the test delineated by the Supreme Court remain to be satisfied. The District Court should have compelled disclosure of the documents only if they were "(1) 'improperly'; (2) 'withheld'" by the CIA. *Kissinger v. Reporters Committee,* 445 U.S. at 150, 100 S.Ct. at 968. Unfortunately, the recent vintage of the Court's three-pronged test means that there is very little case law directly concerned with the meaning of those crucial terms.[65] Nor does the legislative history of the Act provide us much guidance. Once again, therefore, we are cast back upon the premises and objectives of the FOIA as a whole.[66] Those considerations suggest the following definitions:

**62.** *See Tax Reform Research Group v. IRS,* 419 F.Supp. at 425; Note, *The Definition of "Agency Records," supra* note 46, at 1110; House Report, *supra* note 60, at 5–6, *reprinted in* Source Book I 26–27; Senate Report, *supra* note 48, at 3, *reprinted in* Source Book I 38; 110 Cong.Rec. 17,088 (1964) (statement of Sen. Dirksen), *reprinted in* Source Book I 107; 112 Cong.Rec. 13,652 (1966) (statement of Rep. Shriver), *reprinted in* Source Book I 68; 112 Cong. Rec. 13,656 (1966) (statement of Rep. Rosenthal), *reprinted in* Source Book I 75; 112 Cong. Rec. 13,660 (1966) (statement of Rep. Dwyer), *reprinted in* Source Book I 84.

**63.** It might be argued that these policies would be promoted equally well by a rule that all records in an agency's possession (whether created by itself or by other departments covered by the Act) of which the possessor had made some *use* constitute "agency records." *Cf. Kissinger v. Reporters Comm.,* 445 U.S. at 157, 100 S.Ct. at 972 (discussed in note 52 *supra*); *Forsham v. Harris,* 445 U.S. at 177 n. 7, 100 S.Ct. at 983 n. 7 (dicta) ("[R]eliance on a document does not make it an agency record if it has not been created or obtained by a federal agency. Reliance or use may well be relevant, however, to the question of whether a record in the possession of an agency is an 'agency record.' "). The defect in this alternative, more restrictive standard is that it often would be difficult if not impossible for a requester to prove that an official of the agency had indeed relied in some way on a particular document (especially if the requester did not know the contents of the document). *See* Note, *The Definition of "Agency Records," supra* note 46, at 1108. If an agency were at all reluctant to disclose material in files obtained from other departments—or simply kept less than perfect records regarding which documents had been looked at in the course of its decisionmaking— the net effect of the alternative rule would be to deny the public access to many documents that had in fact contributed to the thought and action of agency officials.

**64.** *See Kissinger v. Reporters Comm.,* 445 U.S. at 150–54, 100 S.Ct. at 968–970 (discussed in note 67 *infra* and accompanying text). Even if documents *deliberately* transferred in the manner indicated would be reachable by a FOIA request directed to the originating agency—a question left open by the majority opinion in *Kissinger, see id.* at 155 n. 9, 100 S.Ct. at 971 n. 9—it would be extremely difficult for a requester to prove that the purpose of the transfer was to evade the Act, *see id.* at 166 n. 9, 100 S.Ct. at 976 n. 9 (Stevens, J., concurring in part and dissenting in part). At a minimum, the effect would be to impose considerable extra burdens on a requester.

**65.** Some suggestive comments, consistent with the conclusions we reach below, are contained in *Coastal States Gas Corp. v. Department of Energy,* 644 F.2d at 975.

**66.** *See* text at notes 60–62 *supra.*

"*Withholding*": Certainly a categorical refusal to release documents that are in the agency's "custody" or "control"[67] for any reason other than those set forth in the Act's enumerated exemptions[68] would constitute "withholding." Interpretive problems arise only in the context of processing or referral procedures that are likely to result *eventually,* but not immediately, in the release of documents. The legal status of such procedures seems to us best determined on the basis of their consequences. We conclude, in other words, that a system adopted by an agency for dealing with documents of a particular kind constitutes "withholding" of those documents if its net effect is significantly to impair the requester's ability to obtain the records or significantly to increase the amount of time he must wait to obtain them.

"*Improper*": We are persuaded by Justice Stevens' opinion in *Kissinger* that sensible explication of the term "improper" in this context requires incorporation of a standard of reasonableness.[69] Thus, "withholding" of the sort just described will be deemed "improper" unless the agency can offer a reasonable explanation for its procedure. The form such an explanation would be most likely to take would be a showing that the procedure significantly improves the quality of the process whereby the government determines whether all or por-

tions of responsive documents are exempt from disclosure.[70] Naturally, the more serious the resultant impediments to obtaining records or the longer the resultant delay in their release, the more substantial must be the offsetting gains offered by the agency to establish the reasonableness of its system. At the extreme, a procedure that, in practice, imposed very large burdens on requesters (*e.g.,* by compelling them to pay huge processing costs or to submit separate requests to a number of independent bodies) or that resulted in very long delays would be highly difficult to justify.

█ A principle implicit in the foregoing definitions is that, when an agency receives a FOIA request for "agency records" in its possession, it must take responsibility for processing the request. It cannot simply refuse to act on the ground that the documents originated elsewhere.

█ There is insufficient evidence in the record to determine what result should be reached by applying these standards to the instant case. Neither the decision below nor the affidavits on which it was based make clear the nature of the referral procedure or exactly what advantages were gained by referring each of the documents obtained from the State Department and FBI to the originating body.[71] Nor is the

---

67. That such custody or control is a prerequisite for a "withholding" is the only aspect of the definition of the term settled by *Kissinger;* the majority of the Court declined to "decide the full contours of a prohibited 'withholding.'" 445 U.S. at 150–51, 100 S.Ct. at 968.

68. *See* 5 U.S.C. § 552(b) (1976).

69. *See* 445 U.S. at 166, 100 S.Ct. at 976 (Stevens, J., concurring in part and dissenting in part):

The third and most difficult question is whether the State Department's "withholding" was "improper." In my view, the answer to that question depends on the agency's explanation for its failure to attempt to regain the documents. If the explanation is reasonable, then the withholding is not improper.

Because the majority of the Court concluded that the documents at issue in the case either did not constitute "agency records" or had not

been "withheld," it did not have occasion to consider the meaning of the term "improperly."

70. Thus, for example, the agency might demonstrate that the sensitive or technical character of the materials and the familiarity of the originating agency with their contents means that substantive review by the creator would be more discriminating and rapid than evaluation by the possessor.

71. It does appear that 21 of the 27 documents that originated in the State Department were classified. The District Court held that the CIA lacks authority, under Executive Order 12,065, to declassify those records, *see McGehee v. CIA,* 533 F.Supp. at 868 & n. 16, and we have no reason to doubt the court's conclusion. With regard to those documents, therefore, there would obviously be very important advantages gained by allowing the originating agency to examine and to decide whether to declassify the materials. Those benefits do not

extent of the accompanying impairment of McGehee's ability to gain access to those records apparent.[72] We therefore remand the case with instructions to afford the parties opportunity to adduce additional relevant evidence.

We recognize that the standards we adopt today are not "bright line" tests. The District Court may find it difficult, given the absence of other germane precedent, to apply our holdings to the instant case even when all the facts have been ascertained. To mitigate that uncertainty, and to provide some guidance to courts confronted with similar problems in future cases, we set forth below a model for a referral system. We do not suggest that agencies are bound to accept our plan; we describe it merely to indicate one set of practices that would comport with the general principles embodied in the Act:

---

SAMPLE PROCEDURE FOR PROCESSING DOCUMENTS ORIGINATING WITH OTHER AGENCIES

An agency in possession of documents, responsive to a FOIA request, that it has received from another agency would forward them to the originating body (in lieu of processing them itself) if and only if they satisfied an "intent to control" test.[73] Specifically, an intention on the part of the originating agency that it retain the authority to decide if and when materials are released to the public would have to be made evident by either (i) explicit indications to that effect on the face of each document or (ii) the circumstances surrounding the creation and transfer of the documents.[74]

To minimize the resultant delay, the referral would have to be prompt and public. In other words, as soon as the agency retrieved responsive documents, and possibly even before it undertook an examination of their contents to determine whether they were exempt from disclosure, it would identify those records that originated elsewhere and, if they passed the aforementioned "intent to control" test, would immediately (i) inform the requester of the situation, (ii) notify the originating agency and, (iii) if necessary, forward to the latter copies of the relevant documents. To minimize the burden on the requester, this notification and referral would be accorded the status of a FOIA request; the person seeking information would thereby be relieved of the duty to submit a separate demand to the originating agency.

---

necessarily dispose of the issue before us, however. Congress, when it enacted the FOIA, clearly contemplated that, when an agency other than the one to which a FOIA request was directed had "a substantial interest in the determination of the request," the question whether to release the document might be decided through "consultation, which shall be conducted with all practicable speed." 5 U.S.C. § 552(a)(6)(B)(iii) (1976). Indeed such consultation, not referral to the originating body, is the *only* procedure expressly set forth in the Act that might be used to deal with situations like that before us. Accordingly, while the incapacity of the possessor agency to declassify a particular document provides a compelling reason for the use of some kind of system for soliciting the views of the original classifier, the crucial benefits, for the purposes of the test we are prescribing, are the advantages that would be secured by delegating *all* responsibility for reviewing the document to the originating body rather than engaging in the aforementioned "consultation." Those benefits must then be balanced against any inconvenience to the requester caused by the referral.

As to the remaining six State Department records and the one FBI record, we have even less relevant information. The District Court's discussion of those materials is limited to the conclusory observation that, "the agency that generated the documents is in the best position to determine expeditiously and efficiently the

propriety of disclosure ...." 533 F.Supp. at 868. A more particularized finding of advantage, in terms of the quality of the substantive review, is necessary to justify a referral.

**72.** The current status of the FBI document is unknown. And, though the State Department promptly released portions of its lot, it is unclear what rights, if any, McGehee retains to press that agency for further disclosure.

**73.** *Cf. Holy Spirit v. CIA,* 636 F.2d at 841; *Carson v. U.S. Dep't of Justice,* 631 F.2d at 1010–15 (applying a similar test to documents that originate with Congress and the courts, respectively, discussed in notes 50–51 *supra*).

**74.** Satisfaction of either branch of this test would provide evidence that the quality of the reviewing process would indeed be enhanced by a referral to the first body.

In making the foregoing inference, we are assuming that the agencies would not abuse option (i)—*i.e.,* that they would place an "intent to control" marking on a document forwarded to another agency only if they had good reason (aside from a desire to frustrate FOIA requesters) to wish to retain the right to decide whether the document should be released to the public. If, at some future date, it becomes evident that that assumption was naive, we may have to reconsider the procedures we propose today.

The system we outline, by promoting (i) the processing by the agencies to which requests are submitted of a substantial percentage of the "other agency" records in their possession and (ii) the rapid referral to the originating bodies of the remainder, would mitigate the two most serious hardships associated with the extant automatic referral systems: the inconvenience to requesters of being compelled to assert their rights in two or more independent administrative fora and the long delays resulting from the superimposition of two or more processing sequences.[75]

If, in a given case, the "intent to control" test were satisfied but the agency to which the request was first submitted had not followed the procedures suggested above by the time litigation commenced, the district court would still have some options at its disposal that would enable it to ensure that the petitioner's request was processed expeditiously without sacrificing the benefits accruing from a substantive review by the originating agency. The court might, for example, allow the defendant agency to submit affidavits or present witnesses from the originating agency, explaining which documents are exempt and why. Alternatively, the court could require the originating agency to appear as a party to the suit pursuant to FED.R.CIV.P. 19(a). But these options would be makeshift arrangements; the preferable situation would be adherence to a set of review and referral guidelines of the sort described above.

## IV. INVOCATION OF THE "INTELLIGENCE SOURCE" EXEMPTION

■ McGehee's final allegation of error[76] concerns the District Court's decision to grant summary judgment on the ground that all material withheld by the agency was properly exempt from disclosure under the Act. The CIA defends the ruling below on the ground that it has established that the material in question is covered by FOIA exemptions (1) and (3).[77] In the context of the instant case, the agency observes, those two provisions are functionally equivalent: both shield all information whose disclosure would result in revelation of the identities of "intelligence sources."[78]

The crucial issue, as this matter appears before us, is whether the District Court was warranted in granting the CIA's motion for summary judgment solely on the basis of affidavits submitted by the agency. Here at last we have the benefit of a well-established body of precedent. A long line of cases, decided in this circuit and elsewhere, have prescribed the standards for reviewing claims of exemptions in this procedural context:

> [S]ummary judgment on the basis of such agency affidavits is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.

*Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981) (footnote omitted).[79]

---

**75.** Note, with reference to the second factor, that if the State Department, in the instant case, had used a procedure comparable to the one employed by the CIA, McGehee would have been compelled to wait for almost five years to gain access to any of the documents compiled by the former.

**76.** McGehee also presented a general challenge to the adequacy of the agency's search procedures. Because we are considering several specific aspects of those procedures and remanding for reconsideration of their sufficiency, we do not find it necessary to pass upon appellant's more sweeping allegation.

**77.** 5 U.S.C. § 552(b)(1), (3) (1976).

**78.** The District Court accurately discusses the applicability of the two provisions. *See McGehee v. CIA,* 533 F.Supp. at 866–68.

In their briefs, the parties engage in a heated dispute over the proper definition of an "intelligence source." Given the manner in which we dispose of appellant's challenge to the agency's invocations of exemptions, the precise meaning of that phrase is unimportant. To the extent that said definition becomes relevant on remand, we reaffirm our discussion of the matter in *Holy Spirit v. CIA,* 636 F.2d at 843–44.

**79.** *See also Gardels v. CIA,* 689 F.2d 1100, 1104–05 (D.C.Cir.1982); *Stein v. Department of Justice and FBI,* 662 F.2d 1245, 1253 (7th Cir. 1981); *Halperin v. CIA,* 629 F.2d 144, 148 (D.C. Cir.1980).

The CIA in the instant case satisfies the first and second branches of this composite test. The affidavits submitted by Louis J. Dube describe in considerable detail the grounds for the exemptions claimed by the agency and the reasons why each relevant document falls into one of the categories delineated.[80] The agency likewise passes the third component of the test; no representation made in the Dube affidavits is controverted by other evidence in the record.[81]

On the fourth and final requirement, however, the CIA stumbles. We find that the record contains significant evidence suggesting that the agency has not processed McGehee's request in good faith. Our conclusion is founded principally on the combination of two facts: First, it took almost two and one-half years before the CIA processed McGehee's reasonably straightforward request;[82] indeed, the agency made no substantive response whatsoever until compelled to do so by order of the District Court.[83] Second, the CIA failed to disclose the fact that it was using December 22, 1978, as a cut-off date.[84] The cumulative weight of this evidence of bad faith is enough to vitiate the credit to which agency affidavits are ordinarily entitled.

Accordingly, the District Court's grant of summary judgment was erroneous.

■ It remains to be decided what should be the proper remedy on remand. McGehee urges two solutions on us. First, he requests an instruction to the District Court to permit him to conduct discovery to ascertain the basis of the agency's claim that disclosure of the withheld material would reveal the identities of "intelligence sources." Second, he seeks a directive to the District Court to conduct an *in camera* examination of the documents in question to determine whether the invocations of exemptions were justified.

With regard to the first option, the CIA argues vigorously that an explanation for its actions any fuller than that already made would itself compromise national security.[85] Such a claim should not be disregarded lightly. Although evidence of agency bad faith, as we have shown, undermines the credibility of many of the CIA's allegations, we are unwilling to respond by exposing the agency to McGehee's discovery, at least if there exists any alternative method of testing the agency's right to rely upon the statutory exemptions.

We turn, therefore, to the second proposed remedy. In a recent case, we sum-

---

80. *See* App. 11–78, 163–65. We do not set forth any portions of the affidavits or discuss their contents with any particularity because, as will appear below, our decision in the case in no way hinges upon our judgment that the affidavits satisfy the specificity requirement.

81. Appellant insists that the reason no contrary evidence appears in the record is that the District Court improperly denied him any opportunity to conduct discovery to gather information relevant to the propriety of the agency's invocation of exemptions. Again, because we decide the case on other grounds, we do not reach this question.

82. Recall that McGehee had narrowed his demand to a simple category, "Peoples Temple," on the recommendation of an agency representative. McGehee apparently was persuaded by the representative's argument that such a streamlined request would result in the disclosure of most of the material covered by his original, multifaceted plea and would be processed more quickly. *See* App. 144.

83. We need not decide whether this long delay, by itself, would be evidence of bad faith suffi-

cient to impugn the credibility of the agency's affidavit. In *Goland v. CIA,* 607 F.2d at 355, we held that delay "alone" was not fatal to the agency's position. We did not intend, however, thereby to express our *approval* of the agency's procedures. We are disturbed that, since 1978, there appears to have been no reduction in the agency's backlog or in the associated waiting period that requesters must endure.

84. Even when it finally disgorged documents, the agency failed to inform McGehee of the temporal limitations on its search effort. Apart from an inexcusable oversight, the only plausible explanation for this concealment of a material aspect of its processing system is that the agency hoped that McGehee, ignorant of the fact that he had not been given copies of all responsive, nonexempt documents in the agency's possession, would not submit any supplementary requests. Such tactics are not consistent with the agency's statutory obligations.

85. Affidavit of Louis J. Dube, App. 12–13, 32.

marized the considerations that should guide a district court in deciding whether to conduct an *in camera* inspection of withheld records. In *Allen v. CIA,* 636 F.2d 1287, 1298–99 (D.C.Cir.1980), we identified the following as relevant factors: (a) the number and length of the documents at issue; (b) whether further public justification of the invocation of exemptions is inappropriate because "such justification[ ] would reveal the very information sought to be protected"; (c) the existence and strength of "evidence of bad faith on the part of the agency"; (d) whether the contents of the documents are in dispute; (e) the agency's acquiescence in such a proceeding; and (f) the strength of the public interest in disclosure of the withheld materials (particularly applicable when the question of whether the agency is "properly serving its public function" is involved). Factors (e) and (f), in the instant case, provide McGehee little aid; the CIA actively resists an *in camera* inspection and the "public interest" in revelation of what the CIA knows about the Jonestown incident seems minor. Factors (a) through (d), however, support McGehee's plea. A total of only 44 documents (most of them apparently short) are involved; [86] the CIA itself insists that further public justification is impossible; [87] there is considerable evidence in the record of agency bad faith; [88] and the contents of the documents are contested. This combination of considerations—and especially (b) and (c)—is sufficient to warrant the requested examination.

## CONCLUSION

The judgment of the District Court is reversed. The case is remanded with instructions to afford the parties opportunity to present additional evidence relevant to the matters we have discussed. The District Court should then, on the basis of the standards we have outlined, evaluate the reasonableness of the agency's use of a time-of-request cut-off date and the legality of its procedure for processing the records obtained from the State Department and FBI. The District Court should also consider whether any remedy is due for the CIA's failure to notify appellant of the time-of-request cut-off policy. Finally, the court should undertake an *in camera* inspection of the withheld documents.

We wish to make clear the spirit in which further proceedings in this case should be conducted. This is a controversy impinging on national security. In such circumstances, the judgment of the CIA is to be accorded considerable respect and deference.[89] The Freedom of Information Act nevertheless imposes on the courts the responsibility to ensure that agencies comply with their obligation to "make ... records promptly available to any person" who requests them unless a refusal to do so is justified by one of the Act's specific, exclusive exemptions.[90] Especially where, as here, an agency's responses to a request for information have been tardy and grudging, courts should be sure they do not abdicate their own duty.

*Reversed and remanded for further proceedings consistent with this opinion.*

BORK, Circuit Judge, dissenting in part:

I concur in most of Judge Edwards' excellent opinion and dissent only from the majority's conclusion that the CIA's "bad faith" in dealing with appellant's request for documents necessitates an *in camera* inspection of documents withheld by the agency under the "intelligence source" ex-

---

**86.** 26 documents have been withheld and 18 released with portions deleted. Altogether, the edited documents cover some 36 pages. There is no reason to assume that the records withheld in their entirety are proportionately longer.

**87.** *See* note 85 *supra* and accompanying text.

**88.** *See* text at notes 82–84 *supra.*

**89.** *See Military Audit Project v. Casey,* 656 F.2d at 738.

**90.** *See* 5 U.S.C. § 552(a)(3), (c) (1976 & Supp. V 1981). *See generally* Comment, *Developments Under the Freedom of Information Act— 1981,* 1982 Duke L.J. 423, 432–33 (explicating the courts' responsibility to conduct de novo review even in these sensitive cases of agencies' claims of exemptions).

 

emptions to the disclosure requirements of the Freedom of Information Act. As the majority notes, the CIA has satisfied three of the four tests laid down in *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir. 1981). The affidavits submitted "describe in considerable detail the grounds for the exemptions claimed by the agency and reasons why each relevant document falls into one of the categories delineated." Moreover, no representation made in the affidavits is controverted by other evidence in the record. To this point, the majority's conclusion coincides with the findings and conclusions of the district court. *Supra* at 1100 n. 16, 1112–1113. The majority holds, however, contrary to the district court, that the CIA fails the fourth part of the *Military Audit* test because there is evidence of agency bad faith. That bad faith is shown, it is said, because it took almost two and one-half years before the agency processed appellant's reasonably straightforward request and made no substantive response until compelled to do so by court order, and, second, the agency failed to disclose the fact that it was using the date of appellant's request, December 22, 1978, as a cut-off date for its document searches.

Under *Allen v. CIA,* 636 F.2d 1287 (D.C. Cir.1980), agency bad faith is relevant because it undermines the credibility of the agency's statements in its affidavits. I find nothing in this case which impeaches the credibility of the CIA's affidavits. There is no evidence relating to the affidavits themselves which suggests any credibility problem. There may, of course, be cases in which an agency's general performance evidences such a degree of untrustworthiness that a court would not feel justified in relying upon any of its statements without independent examination of the documents withheld, but I do not find this to be such a case. The district court found that there was no bad faith here, and I agree. Joint Appendix at 221. The CIA's performance here may be far from exemplary, but it appears attributable to bureaucratic inefficiency rather than to a desire to circumvent the law. Thus, I would conclude that all four parts of the *Military Audit* test were

met. *In camera* inspection was not required and summary judgment was properly granted as to documents withheld under FOIA exemptions (1) and (3).