Mark A. ALLEN, Plaintiff,

v.

**DEPARTMENT OF DEFENSE, et al., Defendants.**

Civ. A. No. 81–2543.

United States District Court,
District of Columbia.

March 4, 1983.

James H. Lesar, Arlington, Va., for plaintiff.

Stephen E. Hart, U.S. Dept. of Justice, Washington, D.C. and Michael L. Murray, Asst. Gen. Counsel to the Clerk, Stanley M. Beard, Gen. Counsel to the Clerk, Steven R. Ross, House of Representatives, Washington, D.C., for defendants.

## MEMORANDUM

FLANNERY, District Judge.

Plaintiff, Mark Allen, a researcher seeking information into the assassination of President John F. Kennedy, brings this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1976). Plaintiff seeks access to records of any communications between the United States House of Representatives Select Committee on Assassinations ("HSCA" or "Committee") and the Department of Defense/Defense Intelligence Agency ("DIA") or the Central Intelligence Agency ("CIA").

This matter is before the court on motions for summary judgment by the Executive Branch defendants, the CIA and DIA. The Executive Branch defendants argue that the records are exempt from disclosure pursuant to exemption five of FOIA, 5 U.S.C. § 552(b)(5). In addition, the CIA argues that the documents are exempt from disclosure because they are "congressional" under the test established by this Circuit in *Goland v. Central Intelligence Agency*, 607 F.2d 339 (D.C.Cir.1978), *modified on other grounds*, 607 F.2d 367 (D.C. Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). The CIA also argues that the documents are not improperly withheld within the meaning of FOIA because Congress requested that the agency secure, and limit access to, the documents.

The Clerk of the House of Representatives has filed a memorandum as *amicus curiae*. In that brief, the Clerk argues that all the records at issue are barred from disclosure because of the Speech or Debate Clause of the Constitution, Article I, § 6, cl. 1.

*Facts*

In February, 1977, the House of Representatives passed a resolution authorizing the creation of the HSCA. The Committee was created to ascertain whether an earlier investigation into the assassination of President John Kennedy was adequate and lawfully conducted. The Committee was to

explore, *inter alia*, the conduct of a number of intelligence agencies that had participated in the assassination inquiry and to determine whether there was full disclosure and sharing of information among the agencies.

As part of its investigation, the Committee sought and obtained a large number of documents from the CIA. Many of the documents provided the Committee by the CIA were preexisting CIA documents. Others were documents generated by the CIA in response to Congressional requests for information. During its investigation, the Committee also generated its own documents from CIA materials. Additionally, correspondence was exchanged between the CIA and the Committee. The Committee also requested information from the DIA, albeit on a much smaller scale.[1]

 The material submitted by the CIA to the Committee, as well as the material returned to the CIA from the Committee, was separately compiled and sequestered within a secure area of the CIA.[2] This was done pursuant to a Memorandum of Understanding entered into by the CIA and the Committee designating conditions under which CIA materials would be made available to the Committee. This Memorandum requires that materials provided to the Committee by the CIA be kept and preserved in secure storage at the CIA for at least thirty years unless the Director of the CIA and the House of Representatives agree to a shorter period of time. In addition, no CIA employee is to have access to the compilation without the concurrence of the Clerk of the House of Representatives.

On December 15, 1980, the plaintiff submitted a request to the CIA for "all correspondence or records of any communications between your agency and the U.S. House Select Committee's investigation into the assassination of President John F. Kennedy." On December 29, 1980, the agency replied, stating that the material requested is congressional, and thereby exempt from disclosure under FOIA. On January 6, 1980, plaintiff made an identical request to the DIA. On May 1, 1980, the DIA denied plaintiff's request, asserting that the material is congressional.[3]

On April 6, 1981, plaintiff made a second request under FOIA to the CIA requesting "all records relating to the investigation of the U.S. Select Committee on Assassinations not covered by my FOIA request of December 15, 1980." On June 28, 1981, plaintiff informed the CIA that he deemed its failure to provide him with any records to be a denial of his request and he appealed that determination. Both agencies subsequently denied plaintiff's appeals and reaffirmed their earlier determinations. On October 20, 1981, plaintiff filed this action seeking to compel production of the documents from the CIA and the DIA.

*Discussion*

 Several general principles guide the court in its review of the defendants' claimed exemptions. First, the court must make a *de novo* review of the claims, but in doing so must accord substantial weight to

---

1. DIA states that its collection of Committee materials consists primarily of requests for information from the Committee, and the DIA's responses thereto. The defendants state that the documents held by DIA responsive to plaintiff's request, amounts to no more than a "few dozen documents." Defendants' Mem. at 1.

2. In Defendants' Reply, the defendant CIA noted that certain documents held by the CIA relating to the Committee investigation may have been inadvertently excluded from the segregated CIA–Committee holdings at the agency. On January 10, 1983, the CIA filed a supplemental pleading noting that such materials did exist, and arguing that these materials are protected

by the Memorandum of Understanding despite the CIA's erroneous failure to locate and segregate them. The court agrees that the administrative oversight of the CIA does not frustrate the intent of the Committee-CIA understanding, and that these materials are protected to the same extent as any other materials held in the collection.

3. The DIA initially considered all of the records in its possession responsive to plaintiff's request to be congressional records. However, the DIA has now abandoned this claim and urges merely that the responsive records are agency records exempt from disclosure pursuant to exemption 5 of FOIA. Defendants' Mem., at 2, n. *.

agency affidavits. *See Hayden v. National Security Agency,* 608 F.2d 1381, 1384 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *Ray v. Turner,* 587 F.2d 1187, 1195 (D.C.Cir. 1978). Second, the agency has the burden of justifying nondisclosure by establishing the applicability of the claimed exemption to the material at issue. *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Finally, it is "well settled in Freedom of Information cases as in any others that '[s]ummary judgment may be granted only if the moving party proves that no substantial and material facts are in dispute and that he is entitled to judgment as a matter of law.'" *Founding Church of Scientology v. National Security Agency,* 610 F.2d 824, 836 (D.C. Cir.1979), quoting *National Cable Television Ass'n v. FCC,* 479 F.2d 183, 186 (D.C. Cir.1973). With these principles in mind, this court turns to the contentions of the parties.

Plaintiff seeks access to all documents held by the CIA and the DIA which relate to the Committee's investigation into the assassination of President Kennedy. The defendants claim a number of exemptions for the entire compilation of materials held by them. Defendants make no distinction in the type of material held or its source, nor do defendants attempt to particularize exemptions for each document or category of document held by them. However, the compilations held by the CIA and DIA contain different categories of documents. The compilations contain:

(1) Classified material, from agency files, requested by the committee, and submitted to the Committee by the agency. [This category has been categorized by the CIA in one context as category 1a and 1b materials]. This category shall be referred to herein as "preexisting agency records."

(2) Material generated by the Committee from Agency classified holdings made available to the Committee by the CIA upon the request of the Committee. [The agency has referred to this as category 2 materials]. This category shall be referred to herein as "Committee generated" materials.

(3) Materials and correspondence generated by the Agency in response to explicit Congressional requests. [The agency has included this material within its category 3 materials]. This category shall be referred to herein as "Agency generated" materials.

The defendants' claims of exemption are best examined with reference to the separate categories of documents listed above.

### A. *Congressionally Generated Materials*

▬ Clearly any records generated by the Committee, including reports, correspondence, memoranda, or other documents are exempt from disclosure under FOIA. FOIA governs access to agency records only. 5 U.S.C. § 552(a)(4)(B). However, plaintiff does not seek the records from Congress, but from the Executive Branch agencies. Those agencies have custody of the records, and they are of course subject to FOIA.

The question before the court is whether the congressionally generated materials become agency records vulnerable to FOIA requests because Congress has relinquished possession of them to the agencies. The answer to this question has been resolved by the authority of this Circuit expressed in *Goland, supra* at 347–48, and most recently in *Holy Spirit Ass'n for the Unification of World Christianity v. Central Intelligence Agency,* 636 F.2d 838 (D.C.Cir.1980), *vacated in part,* 455 U.S. 997, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982).

In *Goland* the Court established a test for determining when congressionally generated or created documents, released to an agency for safekeeping, remained congressional documents immune from disclosure under FOIA. Finding that Congress had the authority to keep its records secret even if given to an agency, the Court stated:

Whether a congressionally generated document has become an agency record,

rather, depends on whether under all the facts of the case the document has passed from the control of Congress and become property subject to the free disposition of the agency with which the document resides.

*Goland, supra* at 347.

In *Goland,* the Court considered two factors in making the determination noted above. The Court explored (1) the circumstances surrounding the creation of the document, and (2) the conditions under which it was transferred from Congress to the agency. *Id.* at 347–48. *See also Holy Spirit, supra* at 841. Applying these two factors to the transfer of documents at issue here, this court finds that both the circumstances attending the creation of the documents, and the manifestation of congressional intent when the documents were given for safekeeping to the CIA, demonstrate that Congress has retained control of its documents. The House Committee recognized that the confidentiality and integrity of its documents may be jeopardized by premature disclosure to other persons and therefore negotiated an agreement with the CIA prior to any exchange of information, which provided that the CIA shall segregate its collection and keep it secure. As amended, that agreement reads in part:

Prior to its termination, the Committee will identify to the CIA those documents which are to be made part of the permanent records of the CIA under records schedules approved by the Archivist of the United States, which control the disposal of all Agency records. In view of the large volume of material, it is agreed that physical segregation of the material will not be required in all cases. The Committee will designate those materials provided by the CIA and examined by

the Committee that are to be kept and preserved within a segregated and secure area within the CIA for at least thirty (30) years unless the D.C.I. [Director of the Central Intelligence Agency] and the House of Representatives agree to a shorter period of time.

■ Additionally, in March, 1979, as the Committee was concluding its investigation, Committee Chairman Louis Stokes wrote to the Director of the Central Intelligence Agency, Mr. Stansfield Turner, expressing his understanding that certain Committee and agency generated material be kept secure when transferred to the CIA. The letter read, in pertinent part:

A great deal of material has been generated by your agency in response to specific requests or concerns of the Select Committee. In addition, your Agency is in physical custody of a variety of materials originating from the Select Committee. It can be anticipated that the Agency will receive Freedom of Information Law requests for access to these materials. The purpose of this letter is to request specifically that this Congressional material and related information in a form connected to the Committee not be disclosed outside the Agency without the written concurrence of the House of Representatives.[4]

On April 27, 1979, Mr. Robert Blakely, Chief Counsel to the Committee, visited CIA headquarters to designate that portion of agency held materials to be sequestered. Mr. Blakely stated, with respect to Committee generated material, that he considered this material to be the property of the Committee, and "not releasable to the public or other unauthorized personnel under the provisions of the Freedom of Information Act." Plaintiff's Mem., Appendix,

---

**4.** Plaintiff argues that this letter by Congressman Stokes cannot be construed as an assertion of continued congressional control because, by the time the Congressman had written the letter, the Committee no longer existed. This court finds, nevertheless, that the letter indicates an intent on the part of Congress to assert continued control over the documents. And, although the Committee did expire when the 95th Congress ended in January, 1979, its expiration did not withdraw all authority from Congressman Stokes. Pursuant to House Resolution 49, passed on January 18, 1979, former Chairman Stokes was authorized to "exercise the authority of the former select committee with respect to such Committee." Congressman Stoke's letter of March 26, 1979 was a reasonable exercise of this continued authority.

Memorandum Concerning Robert Blakely's Visit to CIA Headquarters. Mr. Blakely also expressed concern that classified correspondence between the Agency and the Committee be kept secret, and that it should not become part of the public record.

No formal designation agreement was ever entered into between the parties, and the CIA proceeded to segregate all materials relating to the Committee's investigation. The CIA felt that this approach was the best way to abide by the Committee/DCI Memorandum of Understanding, notwithstanding the absence of any formal, written agreement between those two entities describing precisely those materials over which Congress intended to retain control. Affi. Doswell, ¶ 8 n. 6.

█ This court finds that the Memorandum of Understanding, in combination with the Stokes' letter and Blakely's visit to the CIA, clearly indicates an intent on the part of Congress to continue to control certain of the materials kept within the CIA. Congress reached an agreement with the CIA giving the Committee concurrent control over disposition of records, and Chairman Stokes subsequently reasserted his right to insist upon the confidentiality of such records at the time the investigation was ending. A Committee staff counsel then designated certain records as the property of the Committee. Under these facts, congressionally generated documents have not passed from the control of Congress and have not become property subject to the free disposition of the agency with which the document resides. The absence of a formal memorandum of agreement desig-

nating some materials as "congressional" for FOIA purposes is not fatal to defendant's claim in the face of such strong evidence of congressional intent to retain concurrent control.[5] In addition, this court must remain sensitive to the need to protect congressional records from disclosure, a need most recently highlighted by the Court of Appeals for this Circuit in *McGehee v. Central Intelligence Agency*, 697 F.2d 1095 (D.C.Cir.1983). In that case, the court stated:

> [S]pecial policy considerations militate against a rule compelling disclosure of records originating in [Congress] merely because such documents happen to come into the possession of an agency. Congress, we have held, should not be forced to abandon either its long-acknowledged right to keep its records secret or its ability to oversee the activities of federal agencies (a supervisory authority it exercises partly through exchanges of documents with those agencies "to facilitate their proper functioning in accordance with Congress' originating intent").

*Id.* at 1107–08. (Citations omitted).

Those policy considerations are particularly compelling here, where the documents at issue were gathered in furtherance of Congress' responsibility to conduct investigations and perform oversight of federal agencies. Accordingly, congressionally generated documents including memoranda, reports, correspondence, and other documents originating in Congress, are not agency records and disclosure was properly denied to plaintiff.

---

5. *See, e.g., Letelier v. Department of Justice*, No. 79–1984, slip op. at 16–17 (D.D.C. March 31, 1982) (letters from Congressmen expressing committee's intent to retain control over documents sufficient to establish that documents are Congressional). *See also, Dunaway v. Webster*, 519 F.Supp. 1059, 1073–74 (N.D.Cal.1981). The facts indicating congressional control in this case are quite different from those found insufficient to constitute control in *Holy Spirit*. In that case, the plaintiff filed a request pursuant to FOIA for all CIA records relating to a Church and its members. The agency argued that certain of the records were congressional records,

not disclosable under FOIA. The District Court agreed, relying in part on a letter from the Clerk of the House of Representatives objecting to release of the documents written *after* the FOIA request and *after* the litigation had begun. *Holy Spirit*, 636 F.2d at 842. The court of appeals, applying *Goland*, found nothing in the "circumstances of the documents creation or the conditions under which they were sent to the CIA indicating Congress' intent to retain control over the records or to preserve their secrecy." *Id.* In this case, in contrast, the relevant expressions of congressional intent are clear, and occurred prior to the FOIA request.

## B. Agency generated materials

■■■■ The CIA claims not only that congressionally generated materials are exempt from disclosure, but that agency generated documents created in response to congressional inquiries are also exempt from disclosure under *Goland* and *Holy Spirit*. The court of appeals, in *Holy Spirit*, refused to address the issue whether *Goland*, which involved communications from Congress to an agency, "applies to transfers in the other direction." *Holy Spirit, supra* at 843. The Court stated:

> we do not resolve the question whether agency-created records, when sent to Congress, can lose their status as agency records and become exempt from FOIA disclosure.

*Id.* The Court found it unnecessary to reach this issue because it concluded that, even if the CIA created documents were, at one time, congressional because they were generated in response to congressional inquiries and had been transferred to Congress, they subsequently lost that exemption when Congress failed to assert continued control over them. *Id.*

In this instance, Congress has asserted its right to control the agency created documents at issue, and has returned the documents to the agency with instructions for care and safekeeping. Therefore, this court must confront the question left unanswered by *Holy Spirit*. Fortunately, this court has the benefit of a recent court of appeals decision that explores the question at issue here. In *McGehee v. Central Intelligence Agency*, 697 F.2d 1095 (D.C.Cir. 1983), the court sought to determine, *inter alia*, the meaning and scope of the phrase "agency records" as meant by FOIA. Exploring this question in the context of determining whether documents transferred from one agency to another are obtainable from the holding agency, the court found that such documents remain agency records subject to FOIA. The court did note that, under some circumstances, records in an agency's possession that originate in *Congress* are not "agency records" for the purpose of FOIA. How-

ever, the court refused to insulate records held by one agency, but which originated in another agency, from FOIA access. The court stated, "*all* records that originate in agencies covered by the Act constitute 'agency records.'" *Id.* at 1107 n. 50. (Emphasis in original). The court expressly limited *Goland/Holy Spirit* to circumstances in which there is a manifestation "by the *creator* of an intent to *retain* control." *Id.* at 1107 n. 52. (Emphasis in original).

This court interprets *Goland* and *Holy Spirit*, as clarified by *McGehee*, to hold that agency memoranda, reports and other correspondence specifically created by an agency in response to Congressional requests remain subject to FOIA notwithstanding Congress' intent to control the documents. Such an interpretation does not frustrate congressional prerogatives to prevent disclosure of its own confidential materials. Moreover, that interpretation is consistent with the policy underlying FOIA to open the workings of government to public scrutiny. *See Department of the Air Force v. Rose*, 425 U.S. 352, 360–62, 96 S.Ct. 1592, 1598–99, 48 L.Ed.2d 11 (1976). Therefore, the court finds that those portions of the CIA compilation that consist of agency generated documents are not congressional, and therefore are not immune from disclosure under FOIA.

## C. Preexisting records

■■■■ Documents contained in categories 1a and 1b of the CIA–Committee compilation present an exemption claim even more attenuated than that previously discussed. These documents, comprising the bulk of the CIA's holdings, are preexisting CIA documents not generated by Congress or created by the agency in response to a Committee request, but merely retrieved, compiled and indexed for the Committee by the Agency. Pursuant to the authority set forth above, these documents remain agency records, subject to FOIA requests. They cannot, under any reasoning, become congressional through the mere fact of congressional review. These documents never

left the possession of the agency, but were reviewed by the Committee at CIA headquarters. And indeed, a large category of the documents were requested by the Committee, but were never reviewed by Committee staff. [Category 1b]. Such records cannot reasonably be construed as congressional. They are agency records. Accordingly, defendants' argument that this portion of the Committee compilation is exempt from disclosure as a "congressional record" must be rejected.

### D. *Improper Withholding of the Documents*

 The fact that agency generated or preexisting agency records are not congressional does not end this inquiry, for the defendants make a number of alternative arguments. First, the defendants argue that the CIA compilation, in its entirety, may not be disclosed because it is not improperly held within the meaning of FOIA. Section 552(a)(4)(B) of FOIA grants the district court jurisdiction to enjoin agency records and to order the production of any agency records "improperly withheld." The CIA argues that it has not improperly withheld the documents because it has complied with its express understanding with Congress that the documents be sequestered and be unavailable to the public.

The defendants appear to be saying that even if the documents are not congressional under *Goland/Holy Spirit*, the Memorandum of Understanding reflects Congress' demand that the agency not release the documents. This, in turn, according to the defendants, insulates the agency from being compelled to produce the documents through a FOIA request.

The defendants refer the court primarily to *GTE Sylvania, Inc. v. Consumer's Union of the United States*, 445 U.S. 375, 384, 100 S.Ct. 1194, 1200, 63 L.Ed.2d 467 (1980) as support for this rather unique argument. In that case, the Court found that documents were not "improperly withheld" where a court order prohibited the agency from disclosing them. The defendant here wishes to analogize the Memorandum of

Understanding in this case to the court order in *Consumer's Union*, and argues that the Memorandum divests the CIA of discretion to grant plaintiff's requests.

However, the court has already determined that the Memorandum does not insulate the vast majority of the records at issue here from FOIA. If this court were to endorse defendants' argument, it would destroy the carefully constructed and strictly applied *Goland/Holy Spirit* test, and replace it with a test that would require mere agreement between the agency and Congress. The court finds that the records are "improperly withheld" if the agency fails to disclose them, unless they are covered by an exemption found within FOIA, or are exempt under the *Goland/Holy Spirit* formula. Defendants' argument is therefore rejected.

### E. *Interagency Memorandum Exemption*

Finally, the CIA argues that even if the compilation, or parts thereof, are agency records, these agency records are exempt from disclosure under exemption five of FOIA. The DIA joins the CIA in making this argument.

This exemption exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Several courts have found that the language of exemption 5 does not apply to Congress, because Congress is not an agency within the meaning of that section. In *Agee v. Central Intelligence Agency*, 2 GDS ¶ 81364 (D.D.C.1981), the court found that exemption 5 did not apply to several communications between Congress and the CIA which originated in Congress, "since Congress is not an agency within the terms of the statute." *See also Holy Spirit Ass'n for the Unification of World Christianity*, No. 79–151 (D.D.C. Jan. 12, 1983) slip op. at 5. Similarly, in *Navasky v. Central Intelligence Agency*, 499 F.Supp. 269, 277–78 (S.D.N.Y.1980), the court found that certain CIA documents

prepared in response to specific questions from a congressional committee were not exempt under exemption 5 because Congress is not an agency.

Although the language of exemption 5 would seem not to apply to Congress under any circumstances, the court of appeals has indicated that, at least in some circumstances, it does apply. *Ryan v. Department of Justice*, 617 F.2d 781 (D.C.Cir. 1980). *Ryan* concerned certain questionnaires about potential judicial appointees that the Department of Justice had sent to Congressmen. After the questionnaires were completed and returned to the Department, they were subject to a FOIA request. The court of appeals found that the records were agency records. The court then went on to determine whether the records were exempt under exemption 5. The court found that the documents were exempt except for factual segments that did not reveal the deliberative process. *Id.* at 790. In so holding, the court did not find that agency-congressional exchanges are always exempt under exemption 5 but stated:

> When interpreted in light of its purpose, however, the language of exemption 5 clearly embraces this situation. The exemption was created to protect the deliberative process of the government, by ensuring that persons in an advisory role would be able to express their opinions freely to agency decision-makers without fear of publicity.

*Id.* at 789.

■■■■ This court finds that exemption 5 may, in an appropriate case, be applied to agency-congressional communications. *See also Letelier v. Department of Justice*, No. 79–1984 (D.D.C. March 31, 1982); *Paisley v. Central Intelligence Agency*, No. 80–0038 (D.D.C. May 13, 1982), slip op. at 5–6. However, the exemption 5 issue is not suitable for summary judgment at this time. The cautious approach of the court of appeals in *Ryan* requires this court to examine the particular documents at issue, and the degree to which the disclosure of those documents would affect the quality of decisions made by the agency or by Congress. *See Ryan, supra* at 791. This court cannot, on the record and affidavits before it, determine whether any document, or category of documents, "reflect[s] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975), *quoting Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C.1966). Exemption 5 protects only the predecisional deliberative process within agencies in which opinions are expressed and policies formulated and recommended. *Ackerly v. Ley*, 420 F.2d 1336, 1341 (D.C.Cir.1969). Its application depends upon the individual document, and the role that document plays in the administrative process. *Playboy Enterprises, Inc. v. Department of Justice*, 677 F.2d 931, 935–36 (D.C.Cir. 1982).

■■■■ The Executive Branch defendants, CIA and DIA, argue that all the documents disclose the deliberative process of government, and accordingly such documents are exempt from disclosure under exemption 5. However, the defendants' request sweeps far too broadly. It is questionable whether the agency can demonstrate that preexisting agency records released to Congress may fall within exemption 5. It is unlikely that such investigatory records, or internal memoranda become, when viewed by Congress, the predecisional, deliberative type of information protected under that exemption. And, in any event, the agency has not supported its motion by reference to the documents themselves.[6] Nor has the agency attempted to segregate factual from deliberative material. With respect to exemption 5, the courts have long held that it does not protect "purely factual

---

6. Congress has not submitted any affidavits attesting to the compromise of its deliberations that would occur through release of the materials. The only affidavits are those of the agency. Yet it is Congressional deliberations that are at issue here, not those of the CIA or DIA.

material appearing in … documents in a form that is severable without compromising the private remainder of the documents." *EPA v. Mink,* 410 U.S. 73, 91, 93 S.Ct. 827, 837–38, 35 L.Ed.2d 119 (1973); *Ryan, supra* at 790. Accordingly, the defendants' argument that the compilation of documents is exempt under exemption 5 must be rejected at this time.[7]

### F. *Speech and Debate Clause*

The Clerk of the House of Representatives, as amicus, argues that the Speech or Debate Clause of the Constitution exempts all categories of CIA and DIA documents from disclosure. The Executive Branch defendants have not endorsed this argument, and indeed, have opposed it in their motion.

The Speech or Debate Clause provides that congressmen "for any Speech or Debate in either House, … shall not be questioned in any other place." The Clerk submits that the clause is grounded in the constitutional protection for legislative deliberations and is triggered in this instance. Essentially, the Clerk argues that to disclose any of the materials sought by plaintiff would intrude so deeply into Congress' responsibility to consider and pass legislation that the prohibition against "questioning" the legislative process would be contravened.

The Speech or Debate Clause shields matters which are "a integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *United States v. Gravel,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972).

The Clerk argues that the documents at issue here expose the deliberative process. The Executive Branch defendants join the plaintiff in arguing that the Clause does not protect these documents, and that the legislative process would not be impaired by the disclosure of the documents. The court finds that it need not resolve the dispute, or decide whether the Clause may be extended to insulate these documents from FOIA disclosure. The Clerk has been, on its own motion, dismissed as a party defendant. The Clerk appears merely as *amicus.* No member of the House of Representatives has sought to intervene as a party in this action or has alleged impairment of the legislative process as a result of plaintiff's FOIA requests.

Therefore, the court finds no need to adopt or reject the arguments made by the Clerk, or to determine whether the Speech or Debate Clause extends to these documents. *See Holy Spirit Ass'n for the Unification of World Christianity v. Central Intelligence Agency,* No. 79–151 (D.D.C. Jan. 12, 1983), slip op. at 6–7.

---

**7.** The agencies remain free to assert the exemption with respect to individual documents, as well as their own exemption 5 intra-agency exemption for the documents. Defendants also remain free to assert other exemptions under FOIA. In this regard, it should be noted that

defendants have stated that "most of the material viewed by the Select Committee was classified by the CIA for reasons for national security and remains so classified." Defendants' Mem. at 4.