CENTER FOR NATIONAL SECURITY STUDIES, et al., Plaintiffs,

v.

CENTRAL INTELLIGENCE AGENCY, et al., Defendants.

Civ. A. No. 80–1235.

United States District Court, District of Columbia.

Dec. 20, 1983.

Graeme W. Bush, Caplin & Drysdale, Washington, D.C., for plaintiffs.

Patricia J. Kenney, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

JOHN LEWIS SMITH, Jr., District Judge.

Plaintiff Center for National Security Studies brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against defendant Central Intelligence Agency. Currently before the Court are cross-motions for. partial summary judgment with respect to Count IV of the complaint.

Plaintiff in Count IV seeks access to certain materials prepared by defendant in the course of a 1975–76 investigation of the United States intelligence community by the House Select Committee on Intelligence (the "Pike Committee"). In particular, plaintiff seeks to obtain a letter, written by defendant's special counsel, with attached materials, setting forth the intelligence community's response to a draft report prepared by the Committee. This document,

known as the "Rogovin Report," was submitted to the Pike Committee by defendant on January 20, 1976. Defendant retained a copy of the Rogovin Report in its files. *See* Affidavit of Lavon B. Strong at ¶ 10 (hereinafter "Strong Affidavit").

Following completion of the Pike Committee investigation, and a decision by the full House of Representatives against publishing the Committee's report, Committee Chairman Pike and Director of Central Intelligence Bush entered into a written agreement concerning CIA storage of sensitive materials originated by the Committee or furnished to the Committee by the intelligence community. Under the terms of the arrangement, as set out in Chairman Pike's letter of February 20, 1976, and accepted in Director Bush's letter of February 25, 1976, Pike Committee documents, including the original Rogovin Report, were placed in sealed cartons and taken to CIA facilities for safekeeping. In addition, Chairman Pike specified that the materials:

"are placed in [CIA] custody with the explicit understanding that they will not be disturbed, that the cartons containing these materials will not be opened nor their contents examined except on further authorization from the House of Representatives or the Speaker of the House." (Affidavit Exhibits C, D)

On at least three subsequent occasions, certain members of the House corresponded with defendant and others about the arrangement. On April 1, 1976, Speaker Albert denied defendant access to the materials, stating that "it is undisputed that these files are the property of the House." (Affidavit Exhibit F.) In 1979 and 1982, Chairman Boland of the House Permanent Select Committee on Intelligence ("HPSCI"), the successor to the Pike Committee, learned of FOIA litigation involving the materials. On July 13, 1979, Chairman Boland informed Attorney General Bell and Director Turner that "agency documents which were prepared in response to the Pike Committee inquiries and made available to that Committee are Pike Committee documents," to be released only upon the

"express written authorization of this Committee." (Affidavit Exhibit G.) In October 1982, Chairman Boland learned of this litigation. Characterizing plaintiff's Count IV request as involving "Intelligence Community comments on a draft of the report of the [Pike Committee]," Chairman Boland stated on October 27 that "these documents are now the property of the Permanent Select Committee on Intelligence and therefore of the House of Representatives. They should not be released in any way without the express permission of the Committee." (Affidavit Exhibit B.) On March 4, 1983, defendant furnished to plaintiff a copy of Chairman Boland's October 27 letter, and informed plaintiff that, in its view, "control over the Rogovin Report rests with the Congress of the United States rather than the CIA," and therefore, the Report is a "congressional document," "not subject to the disclosure requirements of FOIA." (Defendant's Memorandum Exhibit A.)

Plaintiff, however, is not seeking the original Rogovin Report, but rather the *duplicate* defendant claims it maintained for recordkeeping purposes. This case consequently presents an unusual but narrow issue: whether a 1) duplicate, retained at all times by an agency, and never physically transferred to Congress, of a 2) document prepared and submitted by the agency to Congress, and subsequently returned to the agency under express Congressional directives prohibiting its disclosure and use, is an "agency record" within the meaning of the Act. Upon consideration, the Court concludes that the Rogovin Report is not an "agency record" and therefore is not subject to disclosure under FOIA.

I.

■■■ Under § 552(a)(4)(B) of FOIA, a federal district court has jurisdiction to compel agency disclosure of documents only "upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) *'agency*

records'." *Kissinger v. Reporter's Committee for Freedom of the Press*, 445 U.S. 136, 150, 100 S.Ct. 960, 968, 63 L.Ed.2d 267 (1980) (emphasis supplied). Neither FOIA nor its legislative history, unfortunately, "provides an adequate definition of ['agency records']." *Paisley v. CIA*, 712 F.2d 686, 692 (D.C.Cir.1983). *See also FBI v. Abramson*, 456 U.S. 615, 626, 102 S.Ct. 2054, 2061, 72 L.Ed.2d 376 (1982); *Forsham v. Harris*, 445 U.S. 169, 182, 100 S.Ct. 978, 985, 63 L.Ed.2d 293 (1980); *McGehee v. CIA*, 697 F.2d 1095, 1106 (D.C.Cir.1983) *modified in other respects on reh'g*, 711 F.2d 1076 (1983). The Supreme Court and the Court of Appeals, however, have established certain guidelines to be considered before a document is treated as an "agency record." First, "mere physical location of papers and materials [does not] confer [agency record] status.", *Kissinger v. Reporter's Committee for Freedom of the Press, supra*, 445 U.S. at 157, 100 S.Ct. at 972. Rather, an agency must either "*create* or *obtain* a record as a prerequisite to its becoming an 'agency record' within the meaning of the FOIA," *Forsham v. Harris, supra*, 445 U.S. at 182, 100 S.Ct. at 985 (emphasis supplied). *See generally Wolfe v. Dep't of Health and Human Services*, 711 F.2d 1077, 1079–82 & n. 6 (D.C.Cir. 1983). Second, "an agency cannot have 'obtained' documents until it has possession or control over them." *Id.* at 1079. Third, agency possession of a document, however, does not "*per se* dictat[e] that document's status as an 'agency record'." *Goland v. CIA*, 607 F.2d 339, 345 (D.C.Cir.1978) *vacated in part on other grounds*, 607 F.2d 367 (D.C.Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). *See Wolfe v. Dep't of HHS, supra*, 711 F.2d at 1079 n. 6. Under certain circumstances, records in an agency's possession "may nonetheless be *congressional documents* as opposed to agency records, and so be exempt from disclosure under FOIA," *Paisley v. CIA, supra*, 712 F.2d at 692 (emphasis supplied).[1] *See also McGe-*

---

**1.** Congress is not regarded as an "agency" under the Act, *see* 5 U.S.C. § 552(e), and therefore

"congressional," as opposed to "agency," records, are not subject to the disclosure re-

*hee v. CIA, supra,* 697 F.2d at 1107 & n. 50; *Holy Spirit Ass'n for Unification of World Christianity v. CIA,* 636 F.2d 838, 840 (D.C.Cir.1980), *other portions of decision vacated and remanded as moot,* 455 U.S. 997, 102 S.Ct. 1626, 71 L.Ed.2d 858 (1982). In summary, a document may be within the physical possession of an agency, but it is not subject to disclosure if it is treated as a "congressional record." Resolution of this case turns on whether the Rogovin Report, by virtue of the express Congressional directives regarding its storage and disclosure, is such a "congressional record."

■ On several occasions, the Court of Appeals has directly addressed the questions presented by agency possession of documents generated by *Congress.* The Court has identified two "special policy considerations" that mandate unique treatment: FOIA disclosure requirements should not force Congress to "abandon either its long-acknowledged right to keep its records secret or its ability to oversee the activities of federal agencies (a supervisory authority it exercises partly through exchanges of documents [with agencies]) ...." *McGehee v. CIA, supra,* 697 F.2d at 1107–08 (footnote omitted). *See also Goland v. CIA, supra,* 697 F.2d at 346; *Paisley v. CIA, supra,* 712 F.2d at 693 n. 30. Consequently, the Court in *Goland* held that documents, originating in Congress but in possession of an agency, should be treated as agency records where "under all the facts of the case the document has passed from the control of Congress and become property subject to the free disposition of the agency with which the document resides." 607 F.2d at 347. The inquiry focuses on Congress' "intent to retain control over the document," *Holy Spirit Ass'n for Unification of World Christianity v. CIA,*

*supra,* 636 F.2d at 840, and, as recently explained by the Court:

"Two factors are considered dispositive of Congress' continuing intent to control a document: (1) the circumstances attending the document's creation, and (2) the conditions under which it was transferred to the agency." *Paisley v. CIA, supra,* 712 F.2d at 692.

In brief, if there are "manifest indications that Congress intended to exert control over the documents in an agency's possession," a court must find that the documents are "congressional records," not subject to FOIA's disclosure requirements. *Id.* at 693. *See also Goland, supra,* 607 F.2d at 347; *Holy Spirit Ass'n, supra,* 636 F.2d at 840–42; *McGehee v. CIA, supra,* 697 F.2d at 1107–08 & n. 50; *Ryan v. Dep't of Justice,* 617 F.2d 781, 785–86 (D.C.Cir. 1980); *Allen v. Dep't of Defense,* 580 F.Supp. 74 at 78–80 (D.D.C.1983); *Letelier v. United States Dep't of Justice,* CA No. 79–1984 (D.D.C. March 31, 1982), slip op. at 16–17; *Miller v. CIA,* 2 GDS ¶ 81,174 (D.D.C.1981); *Dunaway v. Webster,* 519 F.Supp. 1059, 1073–74 (N.D.Cal.1981); *Navasky v. CIA,* 499 F.Supp. 269,278 (S.D.N.Y.1980), *aff'd,* 679 F.2d 873 (2d Cir.1981).

The Court of Appeals, however, has addressed but never expressly held that *agency-created* documents, subsequently transferred to and then returned by Congress, may qualify as "congressional records." *See Paisley, supra,* 712 F.2d at 693 n. 30, 695 n. 41; *Holy Spirit Ass'n, supra,* 636 F.2d at 843; *cf. McGehee v. CIA, supra,* 697 F.2d at 1107 n. 50, 1109; *Allen v. CIA, supra,* at 81; *Dunaway v. Webster, supra,* 519 F.Supp. at 1074.[2] In *Paisley* and *Holy Spirit Ass'n,*

quirements of FOIA. *See Paisley v. CIA, supra,* 712 F.2d at 688 n. 2.

**2.** The Court in *McGehee* held that *"all* records that originate in agencies covered by the Act constitute 'agency records'." 697 F.2d at 1107 n. 50, 1109 (emphasis in the original). Relying on *McGehee,* this Court in *Allen v. CIA, supra,* held that materials "specifically created by an agency

in response to Congressional requests remain subject to FOIA notwithstanding Congress' intent to control the documents." At 81. However, *Paisley* was decided six months after *McGehee,* and four months after *Allen v. CIA,* and should be regarded as controlling with respect to the "agency-created" issue. As noted, the Court in *Paisley* specifically left open the possibility that agency-created documents could

however, the Court appeared to rely on *Goland* standards in determining whether CIA-originated documents were properly treated as "congressional records." For example, the Court in *Paisley* examined the asserted "connection of [the] documents to Congress" to determine whether the connection "establish[ed] Congressional control *within the meaning of Goland.*" 712 F.2d at 695–96 (emphasis supplied). Similarly, in *Holy Spirit Ass'n*, the Court based its decision on the absence of evidence of Congressional intent to "retain control" over the agency-generated documents. 636 F.2d at 843. *See also Letelier v. United States Dep't of Justice, supra,* slip op. at 17; *Navasky v. CIA, supra,* 499 F.Supp. at 278. Given that neither agency possession nor agency creation is necessarily dispositive of the agency record issue, that the exchange of documents here occurred pursuant to a very clear exercise of Congress' oversight powers, and the nature of the Court of Appeals' decisions in *Paisley* and *Holy Spirit Ass'n*, the Court concludes that agency-originated materials may, under *Goland*, in certain circumstances be regarded as congressional records.[3]

## II.

Under *Goland*, as noted, the inquiry centers upon the circumstances attending the document's 1) creation and 2) transfer to the agency. *See Goland, supra,* 607 F.2d at 347; *Paisley, supra,* 712 F.2d at 692. *See generally Ryan v. Dep't of Justice, supra,* 617 F.2d at 785. With respect to the "creation" aspect, defendant prepared the Rogovin Report at the direct request of Congress; the Pike Committee sought defendant's review of and comments upon the Committee's draft report. *See* Strong Affidavit at ¶ 9. Although this fact alone does

not establish that the Report is a congressional record, *see Paisley, supra,* 712 F.2d at 695–96, it obviously constitutes a relevant and important "circumstance attending the document's generation." A second aspect of the "creation" test looks to whether Congress intended that agency-generated records would "remain secret." *See Holy Spirit Ass'n, supra,* 636 F.2d at 843. At the time of its request to defendant for comments upon the draft report, the Committee did not make any specific representations that the Report would "remain secret." However ¶ 6(a) of the Pike Committee's enabling resolution required the Committee to take all measures necessary to prevent public disclosure of CIA information obtained from defendant. *See* Strong Affidavit at ¶ 8. The resolution provides some evidence of a Congressional intent, at the time of the Report's creation, to "maintain congressional control over [CIA-submitted materials'] confidentiality." *Goland, supra,* 607 F.2d at 347. *See also Paisley, supra,* 712 F.2d at 694.

■ The second element of the *Goland* test concerns the "conditions under which [the documents] were transferred to the agency." *Id.* at 692. Court of Appeals' decisions place particular emphasis on two particular "conditions": 1) whether the transfer was for a specified "limited purpose and on condition of secrecy," *Goland, supra,* 607 F.2d at 348 n. 48; *Paisley, supra,* 712 F.2d at 695; and 2) whether Congress established *"contemporaneous* and *specific* instructions" to the agency limiting either the use or disclosure of the documents." *Id.* at 694 (emphasis in the original). *See also Holy Spirit Ass'n, supra,* 636 F.2d at 847. The record here plainly reveals the existence of these "con-

---

"become congressional ... by eventual transfer to Congress or by some other means." 712 F.2d at 695 n. 41.

3. Plaintiff argues that agency-originated documents must be evaluated under a different standard: "agency intent to relinquish all control to Congress" in the initial transfer must be established before the Court examines Congressional intent to maintain control. Memorandum of Points and Authorities in Support of Plaintiff's

Motion for Partial Summary Judgment at 5–6 (hereinafter "Plaintiff's Memorandum"). This argument is without support in the case law. Nothing in *Paisley* suggests that *agency* intent is potentially dispositive; to the contrary, the Court looked only to any "indicia of Congressional intent" in evaluating the agency's "congressional record" contention. *See Paisley, supra,* 712 F.2d at 695–96.

ditions." There can be little question that Chairman Pike's February 1976 letter is a "contemporaneous" and "manifest indication" of "Congressional intent to retain control," *Paisley, supra,* 712 F.2d at 693–94, over agency documents submitted to the Committee, including the Rogovin Report. First, the letter specifically states the purpose of the document's transfer to defendant. Second, the letter provides that the materials are not to be disturbed or examined by defendant or any other party without express authorization of the House of Representatives or of its Speaker. The exchange of letters between Chairman Pike and Director Bush in 1976 is not the "one-sided correspondence initiated long after the original creation and transfer of the documents" that the *Paisley* court found deficient. *See Paisley, supra,* 712 F.2d at 695. *See also Holy Spirit Ass'n, supra,* 636 F.2d at 842. With respect to the letters from House members written after the transfer, *Paisley* suggests that such Congressional correspondence may be probative of a continuing Congressional intent to retain control if the letters are not "too general or sweeping" and include "discussion of particular documents." Chairman Boland's 1979 and 1982 letters refer to agency-originated materials provided to the Pike Committee, and the 1982 letter refers specifically to the Rogovin Report. In summary, the Pike letter and subsequent communications constitute the "requisite express indication of a congressional intent to maintain exclusive control over these particular records." *Paisley, supra,* 712 F.2d at 695. Because Congress "manifested its own intent to retain control," the "agency—by definition—cannot lawfully 'control' the documents within the meaning of *Kissinger [v. Reporter's Committee for Freedom of the Press, supra]." Id.* at 693. Certainly nothing in defendant's conduct, as described in the Strong Affidavit ¶¶ 16, 18, and 24–25, suggests that the Report was in any *"meaningful sense* the property of the CIA," or that defendant considered itself in a position to "freely dispose" of the Report. *Goland, supra,* 607 F.2d at 347 (emphasis supplied). The Court

therefore concludes that the Rogovin Report must be treated as a "congressional record" not subject to disclosure under FOIA.

As noted, however, plaintiff is not seeking the *original* Rogovin Report, but rather a *duplicate* defendant maintained for record-keeping purposes. Plaintiff contends that the instructions and limitations contained in the Pike letter apply only to the "actual pieces of paper physically transported to the CIA." Plaintiff's Memorandum at 12. According to plaintiff's interpretation of the custody arrangement, "Congress would control the original and the CIA would control the copy." *Id.* at 11. Because the duplicate remained at all times in defendant's files in accordance with defendant's admitted "normal office practice" of retaining copies of CIA-originated correspondence, plaintiff argues that the duplicate must be regarded as an "agency record."

Plaintiff's position reflects an unduly restrictive view of both the Pike Committee's assertion of control over the Report, and the concept of "agency records" itself. Acceptance of plaintiff's position would require this Court to treat the Rogovin Report and its duplicate as separate and distinct "records" for FOIA purposes, and to ignore the obvious fact that both "documents", although physically distinct, contain the same *information.* Certainly the Congressional interest in the Pike Committee materials cannot be limited to the "actual physical" originals. Congress' directives to defendant can only be reasonably viewed as an assertion of control over the *disclosure of information* contained in the Rogovin Report, and not a concern with the format—original or photocopy—in which that information is presented. As in *Goland,* the arrangement "evidences a Congressional intent to maintain Congressional control over the document's *confidentiality."* 607 F.2d at 347 (emphasis supplied). "Control over confidentiality" means "control over disclosure"; release of a duplicate containing the same information as the original would be clearly con-

**590**

trary to Congress' intent that disclosure of the information, in whatever form, be limited to those situations where *Congress itself* determines that disclosure is appropriate.

Second, and more fundamentally, the Act itself does not require such a literal, "physical," approach to the definition of "agency record." In a 1982 decision involving Exemption 7 of FOIA, 5 U.S.C. § 552(b)(7), the Supreme Court considered the Act's use of the terms "records," "documents," and "information." The issue in *FBI v. Abramson, supra,* was "whether information contained in records compiled for law enforcement purposes loses that exempt status when it is incorporated into records compiled for purposes other than law enforcement." 456 U.S. at 618, 102 S.Ct. at 2057. The Court first noted that "duplicates of original records compiled for law enforcement purposes ... would not lose their exemption by being included" in a non-law-enforcement compilation. *Id.* at 624, 102 S.Ct. at 2061. The Court then observed that "in determining whether information in a requested record should be released, the Act consistently focuses on the nature of the *information* and the effects of disclosure." *Id.* at 626, 102 S.Ct. at 2061 (emphasis supplied). Consequently, the Court held that "information initially contained in a record made for law-enforcement purposes [remains exempted] when that recorded information is reproduced or summarized in a new document prepared for a non-law-enforcement purpose." *Id.* at 631–32, 102 S.Ct. at 2064.[4]

The decision in *Abramson,* with its emphasis on the contents, and not the physical format of documents, does not permit this Court to ignore the fact that the "contents of the *information*" contained in the Rogo-

vin Report and its duplicate are by definition the same. *Abramson* suggests that if duplicates and even summaries of *exempted* records are not subject to disclosure, then duplicates of *congressional* records surely cannot be subject to FOIA's disclosure obligations.

Plaintiff simply draws too fine a line. Nothing in the definition of "agency records," the congressional records doctrine, or in Congress' directions to defendant here indicates that the distinction between original and photocopy is of such great significance. Consequently, the Court concludes that neither the Rogovin Report original nor its duplicate are "agency records" subject to disclosure under FOIA.

Accordingly, defendant's motion for partial summary judgment is granted and plaintiff's motion for partial summary judgment is denied.

---

**4.** Justice O'Connor in dissent distinguished between summaries and verbatim reproductions of exempted records. Noting that summaries typically provide information about the individual who summarizes as well as about the material summarized, Justice O'Connor aptly contrasted the nature of duplicates: *"Any significance a photocopy* may have derives exclusively from its *content* and not from the process of its creation." She further observed that an equally plausible interpretation of the Act as the majority's would not protect summaries, but would hold that a "photocopy, which can never convey anything other than the entire contents of the original document, should *not be disclosed if the original is exempt from disclosure." FBI v. Abramson, supra,* 456 U.S. at 641 n. 12, 102 S.Ct. at 2069 n. 12 (O'Connor, J., dissenting) (emphases supplied).